## RINN et al. v. ASBESTOS MFG. CO. et al.
### No. 6553.

Circuit Court of Appeals, Seventh Circuit.
Nov. 22, 1938.

Rehearing Denied Feb. 16, 1939.

Thomas L. Owens, of Chicago, Ill., for appellants.

Eben Lesh and Joseph H. Lesh, both of Huntington, Ind., for appellee Asbestos Mfg. Co.

Fred Shoaff, of Fort Wayne, Ind., for appellees Wallace, Edson, and Janes.

U. S. Lesh, James E. Lesh, and Samuel T. Lesh, all of Indianapolis, Ind., for appellees Churchman, Evans, LaMont, Towle, Brown, and Joslyn.

Before SPARKS and MAJOR, Circuit Judges, and LINDLEY, District Judge.

LINDLEY, District Judge.

Plaintiffs, on April 14, 1935, as stockholders of the Asbestos Company, brought this suit against the company and its directors, charging the latter with mismanagement and conspiracy to defraud the company and its stockholders and requesting an accounting. Defendants denied the charges and upon trial the court entered

its findings of fact and conclusions of law, dismissing the bill for want of equity. Thereupon plaintiffs appealed.

Of the plaintiffs, stockholders of the company, Rinn owns 100 shares of the par value of $1 each, acquired April 17, 1936; Marshall H. Jackson, 20 shares, acquired March 23, 1933; Irene S. Jackson, 20 shares, acquired March 22, 1933, and Johnson, 100 shares, acquired February 25, 1937. In all plaintiffs own 240 shares out of a total issue of 320,000 plus some 20,000 shares of preferred.

■ In such a stockholders' suit as this, it is necessary that plaintiff allege and prove that he was a shareholder at the time of the transaction of which he complains, or that his holding has since come to him by operation of law; there can be no recovery based on transactions occurring prior to the time when he became a stockholder. Rule 23(b) of Civil Procedure for the district courts of the United States, 28 U.S.C.A. following section 723c. Consequently no allegation or proof of facts occurring prior to March 22, 1933, the earliest date upon which any plaintiff acquired his stock, can be the basis of recovery in this suit or in anywise material except in so far as such fact may be pertinent to the allegations and proof of what transpired subsequent thereto.

Plaintiffs assert that the court should have found the directors guilty of diversion of corporate funds in crediting the sum of $37,500 to Wallace & Company as "special sales expense," and in crediting to Edson a similar sum for "extraordinary company expense"; that a management contract with Wallace dated April 10, 1935 was fraudulent; that defendants permitted the expenditure of corporate funds for sales expense which should have been paid by Wallace; that no services were rendered by Wallace entitling him to any part of the sum paid him; that the contract with the general manager, Evans, was fraudulent, and that the court should have found the facts in accord with these contentions and granted relief accordingly.

■ In disposing of these questions we do not deem it helpful to refer in great detail to the history of the company's management. It is sufficient to observe that, from the original capital investment of $230,000, the company has paid in dividends some $900,000, and has acquired and owns assets of a value many times greater than the amount of the contributed invested capital. There is a sharp contrast between the prosperity of the company and the dividends declared prior to 1930 and since that time. But the company is still without bonded indebtedness; remains in active operation and has come through the depression apparently a solvent going concern. Its products are utilized by the automobile industry, and obviously, its business history must follow from time to time the fluctuations of that industry. Consequently the disparity in earnings in the two periods contrasted is not surprising and is not evidence of fraud, unless the proof shows that it was due to some illegal act or acts committed by the directors as fiduciaries of the stockholders. Judge Slick found no sufficient evidence of such fact and it is incumbent upon plaintiffs to sustain the burden of showing that the evidence submitted to the trial court proved the allegations of the bill.

The first complaint of plaintiffs is directed against the contract made by the company April 10, 1935, with Wallace, whereby he was employed as general manager of sales for five years from June 1, 1935 to May 31, 1940. This agreement provided that defendants Edson and Janes should be associated with Wallace; that the latter would at his own expense employ all necessary assistants to market the company's products and that all selling expenses, including salaries and expenses of salesmen, would be paid by Wallace. In return Wallace and his associates were to receive 7½ per cent of the net selling price of all products manufactured and sold by the company.

This arrangement was not new. In 1925 Edson had entered into a similar contract with the company for the period ending May 31, 1935, whereby he was made general manager of sales on a commission basis of 7½ per cent on sales of original equipment, constituting about 80 per cent of the company's output, and 5 per cent on replacement sales. Out of his commission Edson was obliged to and did pay certain sales expenses. His services continued for ten years, during which the company was at all times prosperous until the fell disaster of the depression.

The new contract with Wallace gave him 7½ per cent of all sales but required him to pay a greater proportion of expenses than those Edson had paid. It

provided also, in contrast with the agreement of 1925, that the company should enjoy the services not only of Edson but those of Wallace and Janes also, each of whom, according to the evidence, was thoroughly experienced in the business and possessed such contacts as to enable him to produce efficient reults as a sales manager.

In the six months ending December 31, 1935, the total commissions paid under Wallace's contract were $27,591.94, of which there was paid to Miley, the Chicago representative, by the sales managers, from their commissions, $3,500; to Janes, $12,092; to Edson, $6,732.67 and to Wallace, $5,267. Janes paid out in sales expenses $6,424, leaving his net compensation for the period, $5,668. Edson paid for expenses, out of the commissions received by him, $6,732, but according to the testimony, in doing so, he incurred sales expenses of $8,380. Instead of a profit, he had a substantial deficit. The evidence is that Wallace incurred expenses of some $4,000, leaving for his net compensation for the period, $1,367.

In the year 1936, plaintiffs insist, Wallace was paid $73,293 on this contract, but the evidence is clear that of this, $6,000 was paid to Miley, and that after the latter's expenses in the Chicago Office were also deducted, the amount actually remitted to Wallace was $62,929. This sum was then divided among those jointly responsible for sales as follows: Janes $27,943; Edson $15,193; Wallace $19,693. Janes paid out of the amount received by him, for expenses, $17,050, leaving to him a net income for the year of $10,900. Edson paid out for expenses $11,435, leaving him a net income of $3,757. Wallace's expenses were at least $5,000; so his total compensation did not exceed $15,193.

Both parties offered evidence as to the propriety of a commission of 7½ per cent of the gross sales for sales expense and profits. The evidence offered by plaintiffs was to the effect that such an allowance should not exceed 3 per cent. That offered by defendant was that 7½ per cent was in line with the compensation usually allowed by other and competing companies engaged in the same business. Furthermore, the evidence shows that for a number of years, substantially the same arrangement had controlled to the common advantage of the company and its stockholders.

Plaintiffs complain, however, that in addition to these expenses for making sales, sums were paid to certain manufacturer's agents. The evidence is that some time prior to 1936, in an effort to promote sales by increasing the number of customer accounts, rather than relying upon a few large accounts, the company adopted the business policy of contracting with a number of manufacturer's agents, who, prior to 1936, received merchandise at a fixed base price and were allowed to retain for their profit the difference between such price and the price at which they resold to their customers. Such profits of the agents were no part of the company's income. However, in 1936 the company altered its policy in this respect and thereafter billed the merchandise sold by the agents to the customers direct, allowing to the agents a commission of 20 per cent. At the end of the year of 1936 there were 39 of such agents receiving commissions of 20 per cent. It is clear, however, that this was not a new and additional selling expense. It was merely the result of the change in the method of invoicing merchandise. According to the original practice, the goods were sold to manufacturer's agents. According to the second, the goods were billed to the customers who were charged retail prices and from the amounts thus collected, 20 per cent was remitted to the manufacturer's agents.

True, directors of a corporation occupy a fiduciary relationship with reference to its stockholders. They must exercise the utmost of scrupulous good faith. This rule is founded upon the demands of morality in business as well as upon a sound industrial policy. But that tenet does not of itself invalidate a contract between three directors and the company where the remainder of the entire Board of nine has no interest in the contract and where the evidence does not sustain a finding of bad faith, fraud or ignorance upon the part of the majority. Bonus and commission contracts made with officers and directors must be scrutinized with a zealous eye for the protection of beneficiaries for whom such persons are fiduciaries. And a court of equity will vigorously condemn any departure from a high standard of conduct. But courts cannot read fraud into contracts. They must have proof before they may act. Here the evidence is consistent only with the district court's finding of good faith.

Plaintiffs assert misappropriation of corporate funds as a result of the action of the Board of Directors of December 12, 1933, when they set up a "Reserve for Contingencies" in the amount of $75,000, and at the same time credited one-half of this, $37,500 to Wallace & Company for "special sales expense." Still later on June 29, 1934, the directors directed that the balance of $37,500 be credited to Edson for "extraordinary company expense."

The proof indicates rather clearly that this charge-off of $75,000 should have been made to profit and loss and not otherwise. To understand this fully, we must refer to the evidence of occurrences prior to the time which is here material. In the year 1929, at the time of the crash in stock market prices, a party connected with the Asbestos Company and responsible apparently for its outlet to certain customers found himself with stock bought on marginal account and insufficient security. He appealed to the directors of this company for a loan and it advanced to him $85,000. This was done in the belief that it was prudent business policy for the company to protect its source of sales. Later it became manifest that the loan could not and would not be repaid. Thereupon preferred stock of the value of the amount of the account was surrendered to the corporation and a contingencies reserve set up in the same amount as a liability. This advancement of $85,000 was charged to Wallace & Company, but the evidence is undisputed that it was merely the conduit by which the sum reached the party who had requested it; that neither Wallace nor his company retained any part thereof, and that no officer or director of the corporation received any benefit therefrom, except such as resulted from the continued retention of its customers.

Though there is no assignment of error covering this contention, as required by Rule 10 of this court, we have examined the record with respect thereto. We find in the circumstances recited, no evidence of fraud. The advancement may have been unwise and injudicious. It was not in itself illegal The Board of Directors had the discretionary power to loan money or extend credit to a customer as a legitimate means of increasing its business. And in view of the retention of the customer as result of the action, we are unable to say as a matter of law that the trial court should have found that the discretion of the directors was abused or that their action was not in good faith. Furthermore the diversion actually occurred long prior to the time when any of plaintiffs acquired stock in the company. Of the propriety of the original loan they are in no position to complain.

Complaint is made of the contract with Evans. He was employed by the company from its beginning as general manager and chairman of the Board of Directors. His salary in 1927 was $15,000 per annum with a bonus in addition. His original contract expired May 31, 1935, and was then renewed for an additional five years. At that time his health had become somewhat impaired. He was, however, not entirely unable to perform his duties. He received a leave of absence, and in July, 1936, proposed to furnish an assistant general manager without additional cost to the corporation and suggested that an adjustment of his salary be made at the annual meeting. On April 14, 1937, the same day this suit was filed, at his request, his salary was reduced to $5,000 for the remainder of his term, without bonus. We find no evidence to justify us in reversing the finding of the District Court that there was no sufficient proof of fraud in this respect.

We have examined the record and considered all of the contentions of plaintiffs; what we have said disposes of all substantial assignments of error. We are not to be understood as relaxing in any manner the requirements of the utmost of good faith upon the part of directors or the duty of courts when bonus contracts are attacked, to scrutinize with the greatest of care and studious regard for the protection of the rights of stockholders all contracts with directors and officers, but the evidence here is such that we cannot say as a matter of law that the trial court was wrong in its finding and should have found that plaintiffs had proved their allegations of fraud.

The decree is affirmed.