## In re BANK OF NEW YORK DERIVATIVE LITIGATION

Nos. 99 Civ. 9977(DC),
99 Civ. 10616(DC).

United States District Court,
S.D. New York.

Nov. 27, 2001.

Milberg Weiss Bershad Hynes & Lerach, LLP, by Melvin I. Weiss, Richard H. Weiss, New York, NY, Morris & Morris, by Karen L. Morris, Irving Morris, Wilmington, DE, Halebian & Feffer, LLP, by Robert I. Harwood, Samuel Rosen, Wechsler Harwood, New York, NY, for Plaintiffs.

Sullivan and Cromwell, by John L. Warden, Richard H. Klapper, New York, NY, for Nominal Defendants.

Solomon, Zauderer, Ellenhorn, Frischer & Sharp, by David E. Nachman, New York, NY, for Defendant J. Carter Bacot.

Squadron Ellenoff Plesent & Sheinfeld LLP, by Lawrence Byrne, Lance Croffoot–Suede, Kathleen P. O'Leary, New York, NY, for Defendants Galizine and Kotov.

Stillman & Friedman, P.C., by Jody L. King, New York, NY, for Defendant Papageorge.

Andrew M. Lawler, New York, NY, for Defendant Renyi.

### OPINION

CHIN, District Judge.

In this shareholder derivative action, plaintiffs Mildred and Edward J. Kaliski allege that certain officers and directors of nominal defendants Bank of New York Company, Inc. (the "Company") and its wholly-owned subsidiary Bank of New York ("BONY") committed systemic wrongdoing in the early and mid–1990's when they sought to expand BONY's banking business in Russia. Plaintiffs, however, did not buy their BONY stock until July 21, 1998, well after all or most of the alleged wrongdoing had occurred.

Defendants move to dismiss the complaint on the ground that plaintiffs have not satisfied the contemporaneous ownership requirements of Federal Rule of Civil Procedure 23.1. and New York Business Corporation Law § 626(b), which require a plaintiff to have actually owned stock in the company at the time of the alleged wrongdoing to have standing to bring a shareholder derivative action. Implicitly acknowledging their lack of standing, plaintiffs cross-move to add as a plaintiff in this action another shareholder who did own stock at the time of the alleged wrongdoing.

The existence of a proper client—a plaintiff with standing to sue—is not a mere technicality; the absence of a suitable plaintiff is not a deficiency that can be remedied two years after the fact. Moreover, derivative plaintiffs represented by experienced counsel are pursuing virtually identical claims in a pending state court action. Consequently, to the extent meritorious derivative claims exist, the interests of the shareholders and nominal defendants will be protected in the state

court proceedings. For these reasons, as discussed more fully below, defendants' motion is granted and plaintiffs' cross-motion is denied.

## BACKGROUND

### A. Factual Background

#### 1. The Alleged Wrongdoing

In their amended complaint, plaintiffs allege the following:

BONY expanded into the Russian banking industry in the early and mid–1990's despite governmental and industry warnings of organized crime and corruption. BONY and its shareholders were harmed as a result. (Am. Compl. at ¶¶ 73, 74, 75). BONY's ill-advised expansion was riddled with unlawful tactics, including tax evasion, money laundering, creation of sham banks, and transfer of funds out of Russia and into suspect offshore accounts. (Id. at ¶¶ 116, 118, 122).

In 1990, BONY purchased a 20% stake in Inter–Maritime Bank, Geneva ("IMB"), renaming it Bank of New York, Inter–Maritime Bank ("BONY–IMB"). (Id. at ¶ 54). BONY installed defendant Deno Papageorge ("Papageorge") on the board of BONY–IMB, where he made contact with controlling shareholder Bruce Rappaport ("Rappaport"). (Id. at ¶¶ 51–54, 57). This relationship was the catalyst for BONY's expansion into the Russian correspondent banking business.

BONY's "blind rush" into the Russian banking market was marked by the restructuring of BONY's European Division and the creation of an Eastern European Division. (Id. at ¶¶ 81, 193). Beginning in 1991 or 1992, Natasha Gurfinkel ("Gurfinkel"), the head of the Eastern European division, collaborated with Vladimir Doudkin ("Doudkin"), Deputy Chairman of Inkombank, and others, on a scheme named "Prokutki," or "spinning around." This

scheme was designed to conceal the illegal movement of U.S. dollars and other asserts out of Russia. (Id. at ¶ 85). These individuals devised and marketed a "global custody system" to manage the accounts and also commissioned an encryption system to enable the BONY and Inkombank conspirators to communicate in secret. (Id. at ¶¶ 87–88). These events marked the beginning of a complex scheme whereby BONY was used as a central conduit for the wire transfer of funds out of Russia. (Id. at ¶ 91).

Ultimately, the wire transfer scheme involved many banks, and while the scheme was devised between 1992 and 1993, at least some behavior occurred in the later 1990's. Plaintiffs highlight complex tax evasion and capital flight schemes concocted by Gurfinkel, Kotov, and the Moscow International Bank ("MIB") "as early as the spring of 1996 and during the several years thereafter." (Id. at ¶ 116). Plaintiffs describe telephone conversations and meetings among the participants concerning the offshore structure that occurred "from 1993 through 1996 and beyond." (Id. at ¶ 101). Plaintiffs also discuss "multiple computer entries prepared during 1993, 1994, 1995, 1996, and thereafter" that reflect conspirators' shares in the offshore companies through which the stolen money was routed. (Id. at ¶¶ 108, 113).

#### 2. Edwards's Guilty Plea

On February 26, 2000, Lucy Edwards, a former vice president of BONY ("Edwards"), her husband Peter Berlin, and three of the shell companies they controlled pled guilty to federal crimes arising out of their activities with BONY. (Id. at ¶ 124). On March 28, 2000, Svetlana Kudryavtsev, an employee of BONY's Eastern European Division, also pled guilty and admitted to receiving a monthly

fee from Edwards to relay information and solve problems that arose in certain accounts. (*Id.* at ¶ 126). The three companies controlled by Edwards and her husband engaged in no lawful business. Instead, after opening BONY accounts for the companies, Edwards and her co-conspirators used the proprietary electronic banking software provided by BONY to move money freely in and out of the accounts. (*Id.* at ¶ 128). Edwards admitted that she and her husband received more than $1.8 million in commissions pursuant to their participation in the conspiracy, which lasted from late 1995 until 1999. (*Id.* at ¶ 131; Pl. Rep. at 23).

### 3. *Breaches of Fiduciary Duty*

In addition to the illegal activities described above, plaintiffs also allege that the director defendants "failed to fully inform themselves to the extent reasonably appropriate under the circumstances as they ignored multiple, specific warnings issued by governmental, regulatory, and private security forces that the Russian banking system was being infiltrated by organized crime—a fact recognized by other banks in the United States, which began to scale down their Russian operations." (Am. Compl. at ¶ 193). For example, In 1996, Russian Central Bank officials notified BONY executives of specific ongoing investigations of several of their correspondent bank customers for internal investigation. (*Id.* at ¶ 138). Plaintiffs detail similar alerts from Russian, American and other international sources throughout the 1990's. (*Id.* at ¶ 123). Plaintiffs also discuss many media reports of corruption in the Russian banking industry, including a May 15, 1994 *New York Times* article reporting that "most of the 2,000 new commercial banks licensed in Moscow in the previous eighteen months were fronts for the illegal transfer of money." (*Id.* at ¶ 9).

Only in 1999 did the director defendants form an Anti–Money Laundering Oversight Committee ("AMLOC"). (*Id.* at ¶ 169). AMLOC's review was limited to "a fraction" of the thousands of Russian banks holding corresponding accounts at BONY. (*Id.* at 170). Ultimately, the defendants failed "to implement and enforce an adequate compliance system or to adequately oversee the development of the business in derogation of their duties to implement compliance controls." (*Id.* at ¶ 193).

### B. *Proceedings in This Court*

This case has now been active for more than two years. Originally, five plaintiffs brought shareholder derivative actions against BONY and nineteen of its former or current officers and directors in this Court. Plaintiffs Mildred and Edward J. Kaliski (the "Kaliskis"), Rita Hochenbaum, and Rochelle Phillips filed one action on September 23, 1999, and Charles -Beck filed another action on October 18, 1999. The cases were consolidated on August 31, 2000. On September 1, 2000, the Kaliskis filed an Amended Complaint, which Hochenbaum, Phillips, and Beck did not join. The Kaliskis purchased 61 shares of BONY stock on July 21, 1998, just 14 months before they▸ filed their original complaint. Following a stock split, the 61 shares became 122 shares. The Kaliskis continue to own 122 shares of stock.

The parties have engaged in extensive discovery. The parties in this action and the parties in the state court action have been cooperating in discovery and taking at least some depositions on a joint basis. BONY served its first requests for the production of documents on plaintiffs' counsel on November 30, 2000; those requests included a request for documents relating to plaintiffs' ownership of BONY stock. Plaintiffs did not, however, produce

documents disclosing the date of the Kaliskis' stock purchase until March 29, 2001. Plaintiffs did not confirm that the 122 shares purchased on July 21, 1998 were the only BONY shares held by the Kaliskis until July 20, 2001. On August 24, 2001, at a pre-trial conference, plaintiffs confirmed that they did not purchase any BONY stock until July, 1998.

The nominal defendants and individual defendants Galitzine and Kotov have filed separate motions to dismiss the amended complaint for lack of standing. Individual defendants Renyi, Papageorge, and Bacot join in the motions.

## C.  Proceedings in State Court

On October 28, 1999, Gilbert Katz filed a derivative action against BONY in the Supreme Court of the State of New York, New York County. Katz owns 20,000 shares of BONY stock, and has owned at least a portion of that stock since 1985. (Frohock Aff., Ex. C). In his amended complaint, Katz alleges, in pertinent part, that "defendants abused the trust placed in them as officers and/or directors of the holding company" and BONY by:

> (1) pursuing Russian banking business through persons who they did not properly supervise with the implementation of adequate policies and procedures; (2) failing to ensure appropriate due diligence on the Russian entities with which TBNY established banking relationships in light of news and information that had been and still is widely disseminated concerning the criminal activities and enterprises throughout Russia; (3) failing to appoint a committee of Board members charged with preventing TBNY from participating in wrongful activities like those alleged herein.

(Frohock Aff. at Ex. D).

In short, Katz's complaint arises from the same alleged misconduct as that alleged in this case. Moreover, Murray Zucker, also a shareholder, filed a derivative action in New York Supreme Court on March 23, 2000.

## DISCUSSION

### A.  Fed.R.Civ.P. 23.1 and N.Y. Bus. Corp. Law § 626(b)

■ Both Federal and New York law require that shareholders own stock in the corporation at the time that the complained-of transaction occurred to have standing to bring derivative actions. *See Ensign Corp., S.A. v. Interlogic Trace, Inc.,* 1990 WL 213085, *n.3 (S.D.N.Y. Dec. 19, 1990) (holding that because both Federal law and New York law contain contemporaneous ownership rules, resolution of the issue would be "the same under either New York or Federal law"). Rule 23.1 provides, in pertinent part, that a complaint in a shareholder derivative action must allege "that the plaintiff was a shareholder or member at the time of the transaction of which the plaintiff complains...." Fed.R.Civ.P. 23.1. For a plaintiff to have standing under New York law, it must "appear that the plaintiff is such a holder at the time of bringing the action and that he was such a holder at the time of the transaction of which he complains." N.Y. Bus. Corp. Law § 626(b).

As Judge Sand explained in *Ensign:* "The policies underlying the requirement are twofold: (1) to prevent potential derivative plaintiffs from 'buying a lawsuit' by purchasing stock; and (2) to insure that derivative actions are brought by shareholders who have actually suffered injury and have an interest in the outcome of the case." *Ensign,* 1990 WL 213085, at *2 (citations omitted).

Some courts have found a limited exception to the contemporaneous ownership requirement. The Fifth Circuit has held

that in cases "where the complaint charged continuing wrongs, occurring at the time plaintiff owned stock, the complaint should not be dismissed on defendant's contention that the claims actually arose prior to the time plaintiff acquired his stock." *Bateson v. Magna Oil Corp.*, 414 F.2d 128, 130 (5th Cir.1969) (citations omitted). As set forth by the Delaware Court of Chancery in *Chirlin v. Crosby*, 1982 WL 17872 (Del.Ch. 1982), the appropriate test in such situations is "whether the wrong complained of is in reality a continuing wrong or one which has, in effect, been consummated. In other words, although in one sense every wrongful transaction constitutes a continuing wrong to the corporation until remedied, the determinative issue is when the specific acts of alleged wrongdoing occur, and not when their effect is felt." *Chirlin*, 1982 WL 17872, *2.

■ The continuing wrong doctrine "has not been universally adopted by the federal courts, and it has been invoked sparingly by those courts that have adopted it." *Ensign*, 1990 WL 213085, at *3 (citation omitted). In addition, "a stranger to the corporation who buys stock with knowledge of the alleged wrongs may not maintain a derivative action even if the wrongs complained of are continuing wrongs." *Leventhal v. Haehl*, 1989 WL 55972, *2 (N.D.N.Y. May 26, 1989) (quoting *Magna Oil*, 414 F.2d at 131).

## B. *Defendants' Motion to Dismiss*

■ The continuing wrong doctrine will not be invoked and defendants' motions to dismiss will be granted, for the following reasons: (1) all relevant acts of wrongdoing occurred before the Kaliskis purchased their stock on July 21, 1998; (2) the continuing wrong doctrine, which is to be ap-

plied "sparingly," if at all, ought not to be invoked here; (3) the circumstances strongly suggest that the Kaliskis purchased their shares to "buy" a lawsuit or, at a minimum, that they have not suffered a significant injury and do not have a representative interest in the case, and (4) the shareholders and the derivative plaintiffs will not be prejudiced by a dismissal of this case because parallel litigation is pending in state court.

First, plaintiffs allege a wide-ranging course of criminal conduct encompassing many individual transactions, but the complaint reveals that all relevant acts of wrongdoing occurred before plaintiffs purchased their stock on July 21, 1998. The only allegations in the complaint that could possibly be construed as occurring after July, 1998 are plaintiffs' allegations about MIB. Plaintiffs state that the meetings among Gurfinkel, Kotov, and senior executives of MIB began in 1996 and continued for "several years thereafter." Given that the critical facts occurred before 1998, merely tacking on the words "several years thereafter" to 1996 is insufficient to confer standing on plaintiffs.

Second, even when considered through the lens of the continuing wrong doctrine—and it is unclear whether the doctrine is the law of this Circuit—plaintiffs' claims still fail for lack of standing.[1] In their reply papers, plaintiffs attempt to disguise the fact that the supposed "acts" of wrongdoing that occurred after July 21, 1998 are either effects of prior wrongdoing or separate incidents altogether. Specifically, plaintiffs argue that the following evidence shows that there was continuing wrongdoing after the Kaliskis' purchase date:

---

**1.** At the pretrial conference before this Court on August 24, 2001, plaintiffs conceded on the record that they had no standing unless the continuing wrong doctrine was found to apply. (Tr. 8/24/01 at 6).

- BONY's opening of a correspondent account for Standard Investments, Nauru, in late 1998 despite the lack of money laundering control in Nauru;
- The failure of BONY to close profitable correspondent accounts even after the scandal became public and AMLOC was formed in 1999;
- Suspicious wire-transfer data after July, 1998;
- The Bank's attempts to downplay the scandal; and
- The misconduct detailed in Edwards's guilty plea.

(Pl. Rep. at 11–23).

Plaintiffs' efforts fail. Certainly, the alleged misdeeds of BONY's officers and directors in the early and mid–1990's had ripple effects into the later part of the decade, and there were individuals such as Edwards who continued her mischief long after the central misconduct had ceased. But the very arguments set forth in plaintiffs' amended complaint make it very clear that the thrust of the money laundering conspiracy occurred from 1992 until 1996. Furthermore, neither plaintiffs' complaint nor plaintiffs' reply portrays Edwards's misconduct as necessarily related to the misconduct begun by BONY's push into Russian correspondent banking. Finally, the few specific post-July 1998 events referenced in plaintiffs' memorandum of law clearly are more in the nature of the effects of wrongdoing rather than independent acts of wrongdoing. If the continuing wrong doctrine is to be applied

at all, it is to be invoked "sparingly." It ought not to be invoked in the circumstances here.

Third, the Kaliskis do not fairly represent the shareholders who have been injured by the alleged wrongdoing. The media influence that plaintiffs use as support for their claims actually works against them by suggesting that plaintiffs' purchase of BONY stock was the purchase of a lawsuit, nothing more. In the amended complaint, plaintiffs emphasize that the overwhelming amount of press coverage regarding illegal activity in the Russian banking industry during the 1990's should have caused BONY to refrain from expanding into Russian banking.[2] Plaintiffs cite a 1994 *New York Times* article as evidence that "the dangers of doing business in Russia were well known to the director defendants." (Am. Compl. at ¶ 9). Plaintiffs also emphasize that there were "innumerable press reports of corruption in the Russian banking industry" in 1996 and 1997. (*Id.* at ¶ 147–8).

Regardless of what these media reports suggest about defendants' guilt, they certainly support the inference that the Kalitskis' purchase of stock was an attempt to purchase a lawsuit. Plaintiffs only bought 61 shares of BONY stock, and they did not do so until July, 1998. Thus, their purchase took place after all or virtually all of the wrongdoing had occurred, and after the same press reports cited had informed the plaintiffs of a potential cause of action.[3]

---

**2.** Plaintiffs contradicted the amended complaint at the August 24, 2001 pre-trial conference, however, when they argued that "there was nothing public about the wrongdoing until 1999." (8/24/01 Tr. at 6).

**3.** The Kaliskis have submitted a declaration attesting to their purported good faith in pursuing their lawsuit. The declaration, however, only raises further questions. It suggests

that the Kaliskis did not actually purchase the stock, but that an unidentified "investment advisor" purchased the 61 shares on their behalf without consulting them. They state that they "believe" the investment advisor purchased the stock "solely based upon his belief that the Company's stock was a good investment." No declaration has been submitted from the "investment advisor."

In *Leventhal,* the court granted defendants' motion to dismiss under Rule 23.1 where plaintiff purchased his stock almost two weeks after the announcement of the commencement of a prudence investigation. *Leventhal,* 1989 WL 55972, *2. The Court noted that "in such a situation, even on a motion to dismiss, the Court may impute to the plaintiff knowledge of the continuing harm of which he complains." *Id.* (citation omitted). The same logic applies to the Kaliskis.

According to defendants' calculations, the Kaliskis' current 122 shares equal only 0.000007625 percent of BONY's outstanding shares. (Def. Mem. at n. 9). Moreover, because the Kaliskis did not purchase their stock until well after all or most of the wrongdoing had occurred and unfavorable reports had been publicized, presumably the price of the stock was already depressed. *See Bangor Punta Operations, Inc. v. Bangor & Aroostoock R.R. Co.,* 417 U.S. 703, 715–16, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974). These circumstances underscore the point that the Kaliskis hardly suffered significant injury because of their stock ownership. Certainly, they have not suffered—if they have suffered at all—to the same extent as shareholders who have owned their BONY stock since before the alleged wrongdoing.

Finally, plaintiffs have not shown that any prejudice will result from dismissal of the amended complaint in this case. Derivative plaintiffs are pursuing nearly identical claims on behalf of BONY in state court. Katz has owned stock in BONY since January, 1985, and he owns substantially more than 122 shares—20,000 shares worth $792,400.00 as of August 30, 2001. (Def. Mem. at 20). Plaintiffs in the state court proceeding are represented by experienced counsel. (Frohock Aff., Ex. D, ¶¶ 55–59, 63–68). For these reasons, the Company, BONY, and their shareholders would not be prejudiced by dismissal of the Kaliskis' claims in this case.

## C. *Norman Drucker's Motion to Intervene*

■ Proposed plaintiff A. Norman Drucker, a resident of Florida, owns 2,304 shares of Company stock. He has been a shareholder in the Company since 1989. While Drucker did own stock during the relevant time period, his motion is denied as untimely.

Under Federal Rule of Civil Procedure 24(a)(2), "to intervene as of right … an applicant must (1) timely file an application, (2) show an interest in the action, (3) demonstrate that the interest may be impaired by the disposition of the action, and (4) show that the interest is not protected adequately by the parties to the action." *New York News Inc. v. Kheel,* 972 F.2d 482, 485 (2d Cir.1992) (citation omitted). "Failure to satisfy *any one* of these requirements is a sufficient ground to deny the application." *Catanzano v. Wing,* 103 F.3d 223, 232 (2d Cir.1996) (quoting *Farmland Dairies v. Comm'r,* 847 F.2d 1038, 1043 (2d Cir.1988)).

The timeliness decision is flexible and is subject to the district court's discretion. *U.S. v. Yonkers Bd. of Educ.,* 801 F.2d 593, 594–5 (2d Cir.1986); *see also U.S. v. Pitney Bowes, Inc.,* 25 F.3d 66, 70 (2d Cir. 1994). "The length of time the applicant knew or should have known of his interest before making the motion" is one of the most important factors to be considered in determining the timeliness issue. *Catanzano,* 103 F.3d at 232. As the Second Circuit has noted, "timeliness defies precise definition." *Pitney Bowes,* 25 F.3d at 70. Among the factors to be considered are "(1) how long the applicant had notice of the interest before it made the motion to intervene; (2) prejudice to existing parties resulting from any delay; (3) prejudice to the applicant if the motion is de-

nied; and (4) any unusual circumstances militating for or against a finding of timeliness." *Id.*, 25 F.3d at 70 (citation omitted).

This lawsuit has been pending for more than two years, and has garnered no small amount of media attention. (De Leeuw Aff., Ex. D). Hence, Drucker has had notice of this action for some time. Shorter delays have often been deemed untimely. *See Catanzano,* 103 F.3d at 232–33; *see also Pitney Bowes,* 25 F.3d at 71. The shareholders and the nominal defendants will not be prejudiced because their interests will be protected in the state court proceedings as well. Drucker will not be prejudiced because his interests will be protected in the state court proceedings. Finally, the unusual circumstances of this case militate against a finding of timeliness. All that transpired when the Kaliskis were the only plaintiffs is now rendered suspect because they were not proper plaintiffs. The addition of Drucker now—two years after the fact—will not eliminate those concerns. *See generally Cohen v. Bloch,* 507 F.Supp. 321 (S.D.N.Y.1980) (granting dismissal where plaintiff's personal commitment to the action was doubtful and it appeared that plaintiff's counsel—who was also the husband of plaintiff's stepdaughter—was the truly interested party).

### CONCLUSION

Defendants' motion is granted. Plaintiffs' cross-motion is denied. The amended complaint is hereby dismissed, without prejudice to the shareholders' claims in the pending state court proceedings. The Clerk of the Court shall enter judgment accordingly.

SO ORDERED.