**In re: BANK OF NEW YORK DERIVATIVE LITIGATION**

**Mildred Kaliski and Edward J. Kaliski, Plaintiffs–Appellants,**

**Rita Hochenbaum and Rochelle Phillips, Plaintiffs,**

**Charles H. Beck, on Behalf of the Bank of New York Company, Inc. Consolidated–Plaintiff,**

v.

**J. Carter Bacot, Gerald L. Hassell, Deno D. Papageorge, Alan R. Griffith, Thomas A. Renyi, John A. Luke, Jr., William R. Chaney, William C. Richardson, Catherine Rein, Richard Barth and Donald L. Miller, Defendants–Appellees,**

**The Bank of New York Company, Inc. and The Bank of New York, Nominal–Defendants–Appellees,**

Sergei Kotov and Vladimir Galitzine,
Defendants–Appellees.

Docket No. 01–9470.

United States Court of Appeals,
Second Circuit.

Argued: Oct. 9, 2002.

Decided: Feb. 12, 2003.

Francis Karam, Milberg Weiss Bershad
Hynes & Lerach LLP, New York, NY

(Melvin I. Weiss, Richard H. Weiss, and Mark T. Millkey, Milberg Weiss Bershad Hynes & Lerach LLP, New York, NY; Karen L. Morris and Patrick F. Morris, Morris and Morris LLC, Wilmington, DE; Robert I. Harwood and Samuel Rosen, Wechsler Harwood Halebian & Feffer, LLP, New York, NY, on the brief), for Plaintiffs–Appellants and proposed Intervenor–Appellant, A. Norman Drucker.

Richard H. Klapper, Sullivan & Cromwell (John L. Warden, Bruce E. Clark, Marc De Leeuw, Todd G. Cosenza and Christina M. Frohock, Sullivan & Cromwell; Andrew M. Lawler and Sharon Feldman, Andrew M. Lawler, PC; Lawrence Byrne and Lance Croffoot–Suede, White & Case, on the brief), New York, NY, for Nominal Defendants–Appellees and Defendants–Appellees.

Andrew J. Levander and David S. Hoffner, Swidler Berlin Shereff Friedman, LLP, David E. Nachman, Solomon, Zauderer, Ellenhorn, Frischer & Sharp, Stephen E. Kaufman, Stephen E. Kaufman, P.C., for Defendant–Appellee J. Carter Bacot, Charles A. Stillman and James Mitchell, Stillman & Friedman, P.C., for Defendant–Appellee Deno D. Papageorge.

Before: OAKES and CABRANES, Circuit Judges, and PRESKA,* District Judge.

JOSÉ A. CABRANES, Circuit Judge.

Plaintiff–Appellants Mildred and Edward Kaliski ("the Kaliskis") brought this shareholder derivative action in the United States District Court for the Southern District of New York (Denny Chin, *Judge* ), alleging that certain officers and directors of the Bank of New York ("BONY") committed systematic wrongs when they sought to expand BONY's banking business in Russia in the early and mid–1990's. In particular, the Kaliskis claim that BONY's ill-advised expansion into the Russian banking industry was riddled with unlawful tactics including. tax evasion, money laundering, the creation of sham banks, and the illegal transfer of funds out of Russia into suspect offshore accounts.

Because the Kaliskis did not purchase their stock in BONY until July 21, 1998, the defendants moved to dismiss the Complaint for lack of standing based upon Federal Rule of Civil Procedure 23.1 and New York Business Corporation Law § 626(b), both of which require that, in order to have standing to bring a shareholder derivative action, a plaintiff must have owned stock in the company at the time of the alleged wrongdoing. The District Court held that the expansion of BONY's banking business into Russia took place prior to July 21, 1998 and, accordingly, it granted the defendants' motion to dismiss the Complaint for lack of standing. The District Court also denied the plaintiffs' cross-motion to add an intervening plaintiff, A. Norman Drucker, who did own stock in BONY at the time of the alleged wrongdoing.

For the reasons set forth below, we affirm the judgment of the District Court.

## I. BACKGROUND

In reviewing the denial of a motion to dismiss or a motion for summary judgment, we must view the facts in the light most favorable to the non-moving party. *See, e.g., Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Abramson v. Pataki*, 278 F.3d 93, 97 (2d

---

* The Honorable Loretta A. Preska, of the United States District Court for the Southern District of New York, sitting by designation.

Cir.2002). The relevant facts, as presented by the Kaliskis, are as follows:

BONY is a financial institution incorporated under the laws of the State of New York. It is wholly owned by, and the principal subsidiary of, the Bank of New York Company, Inc. ("the Company"), one of the largest bank holding companies in the United States. In 1990, BONY began planning the expansion of its business into the Russian banking market. With the collapse of the Soviet Union in 1991, BONY's efforts to transact business in Russia accelerated. In order to facilitate this expansion, BONY reorganized its European Division in the fall of 1992, creating a new Eastern European Division. Several officers within this new division devised a scheme called "Prokutki," or "spinning around," which was designed to conceal the illegal movement of U.S. dollars and other assets out of Russia. Am. Compl., Sept. 1, 2000, ¶ 85. They moved these assets into offshore accounts, taking a percentage of their total value as commission. These officers created a system to manage the accounts and an encryption code that enabled them to communicate about the transactions in secret. They then marketed their "global custody" scheme to numerous Russian banks. *Id.* ¶ 87. This illegal system was devised in 1992, became fully operational during that year, and continued to expand throughout the early and mid–1990s.

The Kaliskis purchased their BONY stock on July 21, 1998. In August 1998, another bank, the Republic Bank of New York, filed a Suspicious Activity Report with the Treasury Department, indicating that it had detected unusual volumes in BONY transfers to Russian accounts.[1] In response to this report, the FBI and the United States Attorney's Office for the Southern District of New York began to investigate BONY. To date, their investigation has triggered a number of indictments, and at least three BONY employees have pleaded guilty to federal crimes. Two of these employees, Lucy Edwards and Peter Berlin, pleaded guilty to illegal conduct that occurred as recently as 1999.

On August 19, 1999, *The New York Times* published a front–page article breaking the story of BONY's illegal conduct. Raymond Bonner and Timothy L. O'Brien, "Activity at Bank Raises Suspicions of Russia Mob Tie," *N.Y. Times,* August 19, 1999, at A1. The article reported that "[b]illions of dollars have been channeled through the Bank of New York in the last year in what is believed to be a major money laundering operation by Russian organized crime." *Id.*

In response to this publicity and to the government investigation, BONY's directors formed an Anti–Money Laundering Oversight Committee in September 1999. According to the Kaliskis, however, the committee's investigation was limited, and although the committee did uncover some "unusual activity," most of BONY's Russian banking business was permitted to continue. Am. Compl., Sept. 1, 2000, ¶ 171.

On September 23, 1999, the Kaliskis filed this derivative suit on behalf of BONY and the Company.[2] In addition to

---

1. Regulations promulgated under the Annunzio–Wylie Act, 31 U.S.C. § 5318(g), require financial institutions to file Suspicious Activity Reports "no later than thirty (30) days after the initial detection of a known or suspected violation of federal law, a suspected transaction related to money laundering activity, or a

violation of the Bank Secrecy Act." 12 C.F.R. § 208.20(d) (1997).

2. The original Complaint was filed by four plaintiffs—the Kaliskis and two others. A second derivative action was filed by another BONY shareholder on October 18, 1999, and the two cases were consolidated on August

naming as defendants numerous BONY officers allegedly involved in the wrongful conduct, the Kaliskis brought suit against individual BONY and Company directors. The Complaint alleges that the director-defendants breached their fiduciary duty to the corporations by "fail[ing] to fully inform themselves [about the Russian banking industry] to the extent reasonably appropriate under the circumstances." *Id.* ¶ 193. Specifically, it alleges that the director-defendants "failed to implement and enforce an adequate compliance system or to adequately oversee the development of the business in derogation of their duties to implement compliance controls." *Id.* The Kaliskis also maintain that the directors "ignored multiple, specific warnings issued by governmental, regulatory, and private security sources that the Russian banking system was being infiltrated by organized crime— a fact recognized by other banks in the United States, which began to scale down their Russian operations." *Id.* To support this contention, the Complaint cites several newspaper and magazine articles as well as reports issued by Russian banks and governmental agencies that warned of extensive money laundering and illegal operations in the Russian banking industry. The Complaint indicates that some of these reports were issued "as early as 1991," and that they "intensified in 1992, 1993, 1994, and forward." *Id.* ¶ 69.

According to the Complaint, the illegal scheme was primarily implemented between 1992 and 1996. On occasion, however, the Complaint suggests that some of the illegal conduct may have continued into the later 1990's. For example, the Complaint states that "[f]rom 1993 through 1996 *and beyond* there were numerous telephone conversations and meetings among the conspirators concerning the off-shore structure, the percentages to which each individual was entitled, and the movement of the money abroad." *Id.* ¶ 101 (emphasis added). The Complaint also indicates that "[m]ultiple computer entries prepared during 1993, 1994, 1995, 1996, *and thereafter* reflect[ed] the conspirators' shares in the offshore companies through which the stolen money was being routed." *Id.* ¶ 108 (emphasis added). Finally, the Complaint alleges that BONY's unlawful relationship with one of its correspondent Russian Banks, Moscow International Bank, began "as early as the spring of 1996" and continued "during the several years thereafter." *Id.* ¶ 116.

During an extensive period of discovery, the Kaliskis produced reports indicating that BONY's relationship with each of the Eastern European banks with which it perpetrated the unlawful transactions persisted into 1999 or 2000. They also produced wire transfer data indicating that BONY may have continued to transfer some money out of Russia after the Kaliskis purchased their BONY stock in July 1998.

On October 28, 1999, Gilbert Katz, a BONY shareholder since 1985, filed a derivative action in the New York State Supreme Court, New York County, against substantially the same defendants and raising substantially the same claims as in the instant action. In his amended complaint, Katz alleges, in pertinent part, that

> [t]he defendants abused the trust placed in them as officers and/or directors of [BONY and the Company] by: (1) pursuing Russian banking business through persons who[m] they did not properly supervise with the implementation of adequate policies and procedures, (2) fail-

---

31, 2000. On September 1, 2000, the Kaliskis filed an Amended Complaint, which the other plaintiffs declined to join. The Kaliskis are the only remaining plaintiffs in this action.

ing to ensure appropriate due diligence on the Russian entities with which [BONY] established banking relationships in light of news and information that had been and still is widely disseminated concerning the criminal activities and enterprises throughout Russia [and] (3) failing to appoint a committee of Board members charged with preventing [BONY] from participating in wrongful activities like those alleged herein.

Katz Am. Compl., Oct. 28, 1999, ¶ 57. Moreover, on March 23, 2000, Murray Zucker, also a BONY shareholder, filed another derivative action in New York Supreme Court against substantially the same defendants and raising substantially the same claims. These two state court actions were consolidated on June 29, 2000 and are still pending.

On August 31, 2001, the defendants in the instant action filed motions to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(c) or, in the alternative, to grant summary judgment in their favor pursuant to Federal Rule of Civil Procedure 56. In support of their motions, the defendants claimed that the Kaliskis lack standing to bring this derivative action under the "contemporaneous ownership" rule set forth in Federal Rule of Civil Procedure 23.1 and New York Business Corporation Law § 626(b), which requires that, in order to have standing to bring a shareholder derivative action, a plaintiff must have owned stock in the company at the time of the alleged wrongdoing.

On October 2, 2001, the Kaliskis filed a memorandum in opposition to the defendants' motion to dismiss, arguing that they have standing based upon the "continuing wrong doctrine" because, although the defendants' wrongdoing commenced before they purchased their stock on July 21, 1998, the illegal conduct continued after that date. The Kaliskis also cross-moved to add A. Norman Drucker as a plaintiff and argued in support of Drucker's own motion to intervene pursuant to Federal Rule of Civil Procedure 24.

On November 27, 2001, the District Court granted the defendants' motion to dismiss. *In re: Bank of New York Derivative Litig. (Kaliski v. Bacot)*, 173 F.Supp.2d 193 (S.D.N.Y.2001) *("Kaliski")*. The Court recognized that "[s]ome courts have found a limited exception to the contemporaneous ownership requirement" where the wrongful conduct began before the plaintiffs obtained their stock but continued after the stock was acquired. *Id.* at 197–98. After acknowledging this "continuing wrong" doctrine, however, the Court conceded that "it is unclear whether the doctrine is the law of this Circuit." *Id.* at 198.

Assuming for purposes of its analysis that this Circuit would recognize the continuing wrong doctrine in some circumstances, the District Court determined that the doctrine was nevertheless inapplicable because "the supposed 'acts' of wrongdoing that occurred after July 21, 1998 are either effects of prior wrongdoing or separate incidents altogether." *Id.* Accordingly, the Court held that the allegedly wrongful transactions upon which the Complaint is based had been concluded before the Kaliskis purchased their BONY stock.

The Court also gave equitable reasons for declining to invoke the continuing wrong doctrine in this case. First, the Court explained that "the Kaliskis do not fairly represent the shareholders who have been injured by the alleged wrongdoing" because "their purchase took place after all or virtually all of the wrongdoing had occurred, and after ... press reports [about corruption in the Russian banking industry] had informed the plaintiffs of a

potential cause of action." *Id.* at 199. Further, the Court reasoned that the Kaliskis "have not shown that any prejudice will result from dismissal of the amended complain in this case" because "[d]erivative plaintiffs are pursuing nearly identical claims on behalf of BONY in state court." *Id.* at 200. For these reasons, the District Court concluded that, because the continuing wrong doctrine "is to be invoked sparingly, ... [i]t ought not to be invoked in the circumstances here." *Id.* at 199.

The Court also denied the plaintiffs' cross-motion to add A. Norman Drucker as a plaintiff. The Court cited the requirement of Federal Rule of Civil Procedure 24(a)(2) that, in order for a party to intervene as of right, an applicant must, *inter alia,* timely file an application for intervention. *Id.* at 200. Noting that the determination of timeliness is subject to its discretion, the Court concluded that Drucker's application for intervention was not timely. *Id.* at 200–01. The Court explained that Drucker had waited over two years to apply for intervention, even though he had considerable notice of the action, which "ha[d] garnered no small amount of media attention." *Id.* at 201. It also noted that "[t]he shareholders and the nominal defendants will not be prejudiced because their interests will be protected in the [parallel] state court proceedings." *Id.*

Judgment was entered in favor of the defendants on December 4, 2001. On December 19, 2001, the Kaliskis timely filed a joint notice of appeal.

## II. DISCUSSION

### A. *Standing*

In this case, the District Court granted the defendants' motion to dismiss the Complaint and for summary judgment on the ground that the Kaliskis lacked standing. "We review the grant of a motion to dismiss or summary judgment *de novo,* accepting as true the factual allegations of the ... complaint[ ] and drawing inferences based upon these allegations in the light most favorable to the ... plaintiffs." *Comer v. Cisneros,* 37 F.3d 775, 786 (2d Cir.1994) (internal citations omitted); *see also, e.g., Abramson v. Pataki,* 278 F.3d 93, 97 (2d Cir.2002). We will affirm an award of summary judgment if the moving party can demonstrate that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Federal Rule of Civil Procedure 23.1, entitled "Derivative Actions by Shareholders," states that a plaintiff does not have standing to bring a derivative suit unless "the plaintiff was a shareholder or member at the time of the transaction of which the plaintiff complains." Similarly, New York Business Corporation Law § 626(b) requires that a plaintiff in a shareholder derivative suit have been "a [share]holder at the time of the transaction of which he complains" in order to have standing. The main purpose of this so-called "contemporaneous ownership" rule is to "prevent[ ] ... courts from being used to litigate purchased grievances." 7C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1828 (2d Ed.1986) ("Wright, Miller & Kane").

In interpreting this rule, federal courts have held that, "[w]hen a series of wrongful transactions is alleged and some of them transpired before plaintiff became a shareholder but others took place subsequent to that date, the shareholder's action may be maintained only on the basis of the later events." *Id.* (citing, *inter alia, Gallup v. Caldwell,* 120 F.2d 90 (3d Cir.1941); *Rinn v. Asbestos Mfg. Co.,* 101 F.2d 344 (7th Cir.1938); *Stephenson v. Landegger,* 337 F.Supp. 591 (S.D.N.Y.1971); *Goldboss v. Reimann,* 55 F.Supp. 811 (S.D.N.Y.

1943), *aff'd*, 143 F.2d 594 (2d Cir.1944)). Courts disagree, however, about exactly what constitutes a single "transaction" for purposes of the contemporaneous ownership rule. *Id.* Some courts have held that an entire series of events constitutes a single transaction, entitling a plaintiff to bring suit for injuries suffered by the corporation subsequent to the plaintiff's acquisition of stock as long as the same series of events continued after the plaintiffs acquired their shares. *Id.* (citing, *inter alia, Bateson v. Magna Oil Corp.*, 414 F.2d 128 (5th Cir.1969); *Hoover v. Allen*, 180 F.Supp. 263, 267 (S.D.N.Y.1960)). This interpretation of the term "transaction" is known as the "continuing wrong doctrine."

The continuing wrong doctrine is frequently considered to be an equitable exception to the contemporaneous ownership rule. *See* Wright, Miller & Kane § 1828. Accordingly, in determining whether to grant derivative standing to a proposed plaintiff who acquired stock in the midst of the alleged wrongdoing, courts have often considered the policies underlying the contemporaneous ownership doctrine and have been particularly influenced by whether the proposed plaintiff knew of the wrongful conduct before purchasing his or her shares. *See, e.g., Ensign Corp. v. Interlogic Trace, Inc.*, No. 90 Civ. 3497(LBS), 1990 WL 213085, at *2–*4 (S.D.N.Y. Dec.19, 1990). But, as explained by one district court within our Circuit, "the continuing wrong doctrine is less an exception to the contemporaneous owner-

ship rule than an expansive definition of what constitutes a 'transaction' as that term is used in Rule 23.1." *Id.* at *3.

■ The Kaliskis argue that we should grant them standing pursuant to the continuing wrong doctrine because BONY's wrongful transaction continued past July 21, 1998. In particular, they allege that BONY maintained its relationships with many of the correspondent Eastern European Banks until 1999 and 2000, and that wire transfer data indicate that money may have continued to be laundered through BONY's accounts after that date.

■ These allegations are insufficient to meet the requirements of the contemporaneous ownership rule. As an initial matter, we decline to adopt the expansive definition of the term "transaction" that is inherent in the continuing wrong doctrine. *See* Wright, Miller & Kane § 1828. Instead, we hold that, in order to invoke derivative standing pursuant to Federal Rule of Civil Procedure 23.1 and New York Business Corporation Law § 626(b), a plaintiff must have owned stock in the corporation *throughout* the course of the activities that constitute the *primary basis* of the complaint.[3] This is not to say that a plaintiff must have owned stock in the company during the entire course of all relevant events. It does mean, however, that a proper plaintiff must have acquired his or her stock in the corporation before the core of the allegedly wrongful conduct transpired.[4]

---

**3.** Absent guidance otherwise from the New York Court of Appeals on this issue, we see no reason to interpret the meaning of the term "transaction" as used in New York Business Corporation Law § 626(b) differently from our interpretation of that term as it appears in Federal Rule of Civil Procedure 23.1.

**4.** Whether the conduct at issue in a given complaint amounts to a continuous transac-

tion or a series of discrete transactions is a fact-specific question to be decided on a case-by-case basis. If a court determines that a single, ongoing transaction is involved, the plaintiff must have acquired stock in the company before all of the core conduct occurred in order to bring suit. If, however, the court determines that the allegedly wrongful conduct consists of a series of separate transactions, a plaintiff may assert standing over

In this case, the Complaint states that "[t]he misconduct alleged against the defendants arose from the Company's and BONY's *aggressive and deliberate push* into the highly risky business of correspondent banking with Russian financial institutions and other businesses." Am. Compl., Sept. 1, 2000, ¶ 3 (emphasis added). Moreover, the Complaint consistently labels the defendants' wrongful conduct as "the *expansion* of BONY's Russian correspondent banking business." *Id.* ¶ 4 (emphasis added). Because BONY's "expansion" (or "aggressive and deliberate push") into the Russian banking industry allegedly took place between 1992 and 1996, the crux of the Complaint objects to conduct that occurred well before the Kaliskis purchased their stock. And even if some BONY accounts continued to receive laundered money after July 21, 1998, the events which constitute the primary basis of the Complaint were completed long before then.

In support of their argument, the Kaliskis note that, on occasion, the Complaint alleges that the relevant conduct occurred through 1996 and "beyond" or "thereafter." *See ante* at 295. But, as the District Court properly concluded, "merely tacking on [such] words . . . is insufficient to confer standing on plaintiffs." *Kaliski,* 173 F.Supp.2d at 198.

The Kaliskis also assert that the plea allocutions of Lucy Edwards and Peter Berlin establish that BONY continued to expand its relationships with Russian banks through 1999. Even if we accept this interpretation of their pleas, however, there can be no doubt that the core of the allegedly wrongful conduct took place prior to July 21, 1998.

Similarly, although the Kaliskis point to the director-defendants' "efforts . . . to play down and cover up the breadth of the Bank's money-laundering scandal" after July 21, 1998, Pls.' Br. at 22, this alleged behavior is simply evidence of the defendants' *response* to the situation that resulted from their expansion into the Russian banking industry—it does not constitute the core basis of the Complaint.

In sum, we decline the Kaliskis' invitation to adopt an expansive definition of the term "transaction" for the purposes of Federal Rule of Civil Procedure 23.1 and New York Business Corporation Law § 626(b). Instead, we hold that, in order to assert standing under the contemporaneous ownership rule, a plaintiff must have owned stock in the corporation throughout the course of the activities that constitute the primary basis of the complaint. Because we agree with the District Court that the plaintiffs "did not buy their BONY stock until . . . well after all or most of the alleged wrongdoing had occurred," *Kaliski,* 173 F.Supp.2d at 194, we hold that the plaintiffs cannot satisfy the contemporaneous ownership rule. Accordingly, they lack standing to bring this derivative suit.

## B. *Motion to Intervene*

In order to prevent a judgment in favor of the defendants, A. Norman Drucker, a shareholder in the Company since 1989, filed a motion to intervene as a plaintiff. The District Court denied Drucker's motion as untimely. *Kaliski,* 173 F.Supp.2d at 200–01.

 We review a district court's denial of a motion to intervene for abuse of discretion. *See, e.g., In re Holocaust Vic-*

---

those transactions for which the core conduct occurred after the plaintiff acquired stock in

the company.

*tim Assets Litigation,* 225 F.3d 191, 197 (2d Cir.2000). "In order to intervene as a matter of right under Fed.R.Civ.P. 24(a)(2), an applicant must (1) timely file an application, (2) show an interest in the action, (3) demonstrate that the interest may be impaired by the disposition of the action, and (4) show that the interest is not protected adequately by the parties to the action." *New York News, Inc. v. Kheel,* 972 F.2d 482, 485 (2d Cir.1992).[5] "Failure to satisfy *any one* of these requirements is a sufficient ground to deny the application." *Catanzano by Catanzano v. Wing,* 103 F.3d 223, 232 (2d Cir.1996) (quoting *Farmland Dairies v. Comm'r,* 847 F.2d 1038, 1043 (2d Cir.1988)) (internal quotation marks omitted).

■ As the District Court properly noted, the determination of whether an application is timely is subject to the district court's discretion. *See, e.g., United States v. Yonkers Bd. of Educ.,* 801 F.2d 593, 594–95 (2d Cir.1986). In making this determination, courts should consider "(1) how long the applicant had notice of the interest before it made the motion to intervene; (2) prejudice to existing parties resulting from any delay; (3) prejudice to the applicant if the motion is denied; and (4) any unusual circumstances militating for or against a finding of timeliness." *United States v. Pitney Bowes, Inc.,* 25 F.3d 66, 70 (2d Cir.1994).

■ The District Court gave three separate reasons for its decision to deny Drucker's application as untimely. First, the Court found that, because "[t]his law-

suit has been pending for more than two years, and has garnered no small amount of media attention ... Drucker has had notice of this action for some time." *Kaliski,* 173 F.Supp.2d at 201. Next, the Court noted that "[t]he shareholders and the nominal defendants will not be prejudiced because their interests will be protected in the state court proceedings as well." *Id.* The Court added that Drucker's own interests would be equally well-protected by the derivative action in state court. Finally, the Court held that "the unusual circumstances of this case militate against a finding of timeliness" because "[a]ll that transpired [in the litigation] when the Kaliskis were the only plaintiffs is now rendered suspect because they were not proper plaintiffs." *Id.*

The Kaliskis argue that the District Court abused its discretion because (1) the delay in Drucker's application for intervention has not caused any prejudice to the defendants, (2) "when an original derivative plaintiff lacks standing, intervention is the usual and favored course," Pls.' Br. at 51 (capitalizations omitted), and. (3) the shareholders will be prejudiced by dismissal of the instant action because (a) although the parallel lawsuit pending in state court pertains to the same transaction, it does not raise all of the particular claims that have been raised in this case and it does not name all of the same defendants, and (b) "counsel for Mr. Drucker, in their role as counsel to the Kaliskis, have devoted enormous resources to both the corruption and failure-of-oversight aspects of the case," *id.* at 56.

---

**5.** Substantially the same factors are considered in determining whether to grant an application for permissive intervention pursuant to Fed.R.Civ.P. 24(b)(2). *See, e.g., H.L. Hayden Co. v. Siemens Med. Sys., Inc.,* 797 F.2d 85, 89 (2d Cir.1986). Because permissive intervention is (by definition) never mandatory, however, "[r]eversal of a district court's deni-

al of permissive intervention is a very rate bird indeed." *United States v. Pitney Bowes, Inc.,* 25 F.3d 66, 73 (2d Cir.1994). Accordingly, insofar as we affirm the District Court's denial of Drucker's motion to intervene as a matter of right, we need not also examine its denial of permissive intervention.

These arguments are without merit. While the defendants in this action may not have been prejudiced by the delay, that fact, standing alone, is insufficient to render the District Court's holding an abuse of discretion. Furthermore, contrary to Drucker's assertions, there is no reason to believe that the shareholders' interests will not be adequately protected by the parallel state court proceedings simply because the plaintiffs in that action have chosen a slightly different strategy and have raised slightly different claims. And even if it were true that courts generally permit intervention when an original derivative plaintiff lacks standing, that practice is not relevant here *precisely because* the interests of the Company and BONY are being adequately protected by the state court action. Finally, although counsel for the Kaliskis and Drucker may have already "devoted enormous resources" to this action, courts generally do not consider the asserted hardship or benefit to attorneys when deciding whether to grant a motion to intervene.

## V. Conclusion

In sum, we hold that (1) in order to invoke derivative standing pursuant to Federal Rule of Civil Procedure 23.1 or New York Business Corporation Law § 626(b), a plaintiff must have owned stock in the corporation before the core of the allegedly wrongful conduct transpired, (2) BONY's allegedly unlawful expansion into the Russian banking industry constitutes the primary basis of the Complaint, (3) because that expansion occurred primarily between 1992 and 1996, and because the Kaliskis did not acquire their stock until July 21, 1998, they lack standing under Federal Rule of Civil Procedure 23.1 and New York Business Corporation Law § 626(b), and (4) the District Court did not abuse its discretion in denying A. Norman

Drucker's motion to intervene as a plaintiff.

Accordingly, the judgment of the District Court is affirmed.