PLYMOUTH COUNTY RETIREMENT
ASSOCIATION, Plaintiff,

v.

James SCHROEDER, Shelly Boxer, Barbara Schwartz, David Sandler, Steven Tudor, Melvin Redman, Charles Moyer, Ross Anker, Charles Boehlke, Mitchell Jacobson, Roger Fradin, Denis Kelly, Raymond Langton, and Philip Peller, Defendants,

and

MSC Industrial Direct Co., Inc., Nominal Defendant.

No. 07–CV–04772 (ADS)(ETB).

United States District Court, E.D. New York.

Sept. 5, 2008.

The Shapiro Firm LLP by Jonathan S. Shapiro, Esq., Robert J. Shapiro, Esq., of Counsel, New York, NY, for Plaintiff.

Skadden, Arps, Slate, Meagher & Flom LLP by Scott D. Musoff, Esq., of Counsel, New York, NY, for Defendants and Nominal Defendant.

### MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

On November 15, 2007, Plymouth County Retirement Association ("Plymouth" or the "plaintiff") commenced this shareholder derivative action against defendants Charles Boehlke, Mitchell Jacobson, Roger Fradin, Denis Kelly, Raymond Langton,

Philip Peller, James Schroeder, Shelley Boxer, Barbara Schwartz, David Sandler, Steven Tudor, Melvin Redman, Charles Moyer, and Ross Anker (collectively, the "defendants") for the benefit of nominal defendant MSC Industrial Direct Co. Inc. ("MSC" or the "Company"), a New York corporation with its headquarters in Melville, New York, alleging the defendants' involvement in a scheme to backdate stock options issued to certain directors and executives. MSC is a direct marketer and distributor of industrial products, including maintenance, repair, and operations supplies.

Presently before the Court are two separate motions to dismiss. The first is a motion by MSC to dismiss the complaint for lack of standing to maintain a derivative action on behalf of the corporation. The second is a motion to dismiss by the individual defendants, who assert that the plaintiff's causes of action are time-barred and otherwise insufficient to state a claim for relief.

## I. BACKGROUND

On November 15, 2007, Plymouth filed a verified shareholder derivative complaint against the defendants on behalf of and for the benefit of the nominal defendant, MSC. The complaint alleges that certain members of the Board of Directors (the "Board") and certain of its executive officers were involved in a "secret scheme of backdating option grants to and for the benefit of certain MSC executive officers as well as other MSC employees." (Compl. ¶ 1.). The issue of backdating stock options was first brought to light by a one-page article published in the *Wall Street Journal* on March 18, 2006. *See Ryan v. Gifford,* 918 A.2d 341, 345 (Del.Ch.2007). That article was based upon an academic's review of numerous option grants, "which revealed an arguably questionable compensation practice." *Id.* Following the publication of the *Journal* article, Merrill Lynch & Co., Inc. issued a report opining that officers in several companies "had benefited from so many fortuitously timed stock option grants that backdating seemed the only logical explanation." *Id.* at 345–46.

According to the complaint,

A stock option is the right to purchase a stock for a specified period of time at a fixed price, called the "exercise price" or "strike price." The exercise price is generally fixed to the market price of the stock on the date of the grant. If the stock's market price exceeds the exercise prices, the option holder may exercise the stock option, by purchasing the stock from the Company at the exercise price, and reselling it at the higher market price, profiting from the difference.

(Compl.¶ 1n.1).

In addition, the complaint states that:

[R]etroactive dating, or "backdating" [permits] the grantor to select the most advantageous price for the stock option and in effect create an "in the money" stock grant (one which the actual stock price exceeds the option price on the day granted), that would appear as if it was granted while the stock price was low. Since companies are required to report "in the money" grants as compensation to the recipient and as a charge to the corporation, the practice of backdating would provide a means to consider additional stock value, or compensation, to officers and employees that was not detectable, thereby permitting the company to conceal the additional compensation and forego reporting or recording the charge.

When the grant date of a stock option is manipulated to an earlier date on which the stock closed at a lower price—i.e. when the stock option is "backdated"—the grantee pays less for the stock

and the corporation, the counterparty to the stock option grant, received less when the stock option is exercised. When stock options are backdated in this manner for the benefit of insiders (as they were in this case), the stated purpose behind a stock option plan—to strengthen the Company's ability to retain key employees and motivated such employees to remain focused on long-term stockholder value performance—is undermined to the detriment of the Company and its shareholders, because the granted stock options are already "in the money."

(Compl. ¶¶ 3–4).

The plaintiff sets forth the roles of each defendant in MSC as follows, in pertinent part:

James Schroeder ("Schroeder") has served as Senior Executive Project Manager of the Company since December 2005. Schroeder also served as a director of the Company since its inception in October 1995 to January 2004.... Schroeder participated in the issuance of and signed MSC's [allegedly] false and misleading shareholder reports, including MSC's proxy statements for 1997–2002.

Shelley Boxer ("Boxer") has served as the Company's Vice President of Finance since June 2000. Boxer also served as a director of the Company since its inception in October 1995 to January 2004.... Boxer participated in the issuance of and signed MSC's [allegedly] false and misleading shareholder reports, including MSC's proxy statements for 1997–2002.

Barbara Schwartz ("Schwartz") served as Vice President of Human Resources of the Company from October 1995 to in or about 1999.

David Sandler ("Sandler") has served as a director of MSC since June 1999 [to the present] and as President and Chief Executive Officer since November 2005.... As a member of the Board, Sandler participated in the issuance of and signed MSC's [allegedly] false and misleading shareholder reports, including MSC's proxy statements for 1999–2002.

Steven Tudor ("Tudor") served as Senior Vice President of Sale and Branch Operations of the Company from August 1997 to March 1999.

Melvin Redman ("Redman") served as a director of the Company from April 1996 to 1998 and as President and Chief Operating Officer in 1998.

Charles Moyer ("Moyer") served as the Company's Senior Vice President of Marketing and Product Development from August 1997 to in or about 1999.

Ross Anker ("Anker") served as the Company's Senior Vice President of Product Management and Information Systems from September 2001 to March 2006.

Charles Boehlke ("Boehlke") has served as Executive Vice President of the Company since January 2003, as Chief Financial Officer since June 2000 and as a director since January 2001 [to the present].... As a member of the of the Board, Boehlke participated in the issuance of and signed MSC's [allegedly] false and misleading shareholder reports, including MSC's proxy statements in 2002.

Mitchell Jacobson ("Jacobson") has served as a Chairman of the Board of the Company since January 1998 [to the present] and as a director since October 1995.... As a member of the Board, Jacobson participated in the issuance and signed MSC's [allegedly] false and misleading shareholder reports, including MSC's proxy statements for 1997–2002.

Roger Fradin ("Fradin") has served as a director of the Company, as a member of the Audit Committee of the Board (the "Audit Committee") and as a member of the Compensation Committee of the Board (the "Compensation Committee") since July 1998 [to the present]. As a member of the Board, Fradin participated in the issuance of and signed MSC's [allegedly] false and misleading shareholder reports, including MSC's proxy statements for 1997–2002.

Defendant Denis Kelly ("Kelly") has served as a director of the Company, as a member of the Audit Committee and as a member of the Compensation Committee since April 1996 [to the present]. As a member of the Board, Kelly participated in the issuance of an signed MSC's [allegedly] false and misleading shareholder reports, including MSC's proxy statements for 1997–2002.

Defendant Raymond Langton ("Langton") has served as a director of the Company, as a member of the Audit Committee and as a member of the Compensation Committee since July 1997 [to the present]. As a member of the Board, Langton participated in the issuance of and signed MSC's [allegedly] false and misleading shareholder reports, including MSC's proxy statements for 1997–2002.

Defendant Philip Peller ("Peller") has served as a director of the Company, as a member of the Audit Committee and as a member Compensation Committee since April 2000 [to the present]. As a member of the Board, Peller participated in the issuance of and signed MSC's [allegedly] false and misleading shareholder reports, including MSC's proxy statements for 2000–2002. (Compl.¶¶ 19–32).

Therefore, by the plaintiff's account, the present Board is made up of defendants Sandler, Boehlke, Jacobson, Fradin, Kelly, Langton, and Peller, each participating since January 2001, or earlier. In addition, the Audit and Compensation Committees are made up of defendants Fradin, Kelly, Langton, and Peller.

## II. DISCUSSION

### A. As to MSC's Motion to Dismiss for Plaintiff's Lack of Standing

Nominal defendant, MSC, contends that the plaintiff lacks standing to bring this action. First, MSC contends that the plaintiff has failed to make a demand upon the present Board of Directors and has failed to establish that such a demand is excused as futile. Specifically, MSC states that the plaintiff has failed to sufficiently allege that a majority of the Board is "interested" in a way that would interfere with their independence because (1) a four member majority of the Board is not alleged to have personally received backdated stock options, and (2) the plaintiff has failed to plead the existence of any backdating scheme. Second, MSC contends that the Plymouth has failed to allege that it owned MSC stock at the time of the transactions in issue.

#### 1. Futility of Demand

■ "The derivative form of action permits an individual shareholder to bring suit to enforce a *corporate* cause of action against officers, directors, and third parties." *Stoner v. Walsh,* 772 F.Supp. 790, 795 (S.D.N.Y.1991) (internal quotations and citations omitted). However, the plaintiff must demonstrate that the corporation refused to proceed with the suit after a suitable demand was made on the corporation "unless excused by extraordinary condition." *Id.* (internal quotations and citations omitted). Indeed, the plaintiff must state with particularity "any effort ... to obtain the desired action from the directors or comparable authority and,

if necessary, from the shareholders or members; and the reasons for not obtaining the action or not making the effort." Fed R. Civ. P. 23.1(b)(3).

The purpose of this demand requirement is "to give the derivative corporation itself the opportunity to take over a suit which was brought on its behalf in the first place, and thus to allow the directors the chance to occupy their normal status as conductors of the corporation's affairs." *Lewis v. Graves*, 701 F.2d 245, 247 (2d Cir.1983) (internal quotations and citations omitted). When the members of the board of directors of a corporation have a fiduciary duty to take action, a court cannot be certain that the board will breach that duty. *See Elfenbein v. Gulf & Western Industries, Inc.*, 590 F.2d 445, 450 (2d Cir.1978). Further, the demand requirement, "promotes policies of judicial economy because a demand may result in corrective action from the body that is usually in the best position to correct and investigate alleged abuses, and is also designed to discourage 'strike suits' by shareholders making reckless charges for personal gain rather than corporate benefit." *Stoner*, 772 F.Supp. at 796.

■ As defendant MSC is a New York Corporation, the adequacy of the demand requirements is governed by New York Corporate law. *See Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 98–101, 111 S.Ct. 1711, 1716, 114 L.Ed.2d 152 (1991); *see also Kalin v. Xanboo, Inc.*, 526 F.Supp.2d 392, 409 (S.D.N.Y.2007). Under New York law, in a derivative action, "the complaint shall set forth with particularity the efforts of the plaintiff to secure the initiation of such action by the board or the reasons for not making such effort." N.Y. Bus. Corp. Law § 626(c).

■ The plaintiff may establish that the demand requirement is excused where the demand would have been futile due to direct involvement in wrongdoing by the members of the Board. *See Tuscano v. Tuscano*, 403 F.Supp.2d 214, 223 (E.D.N.Y.2005). "[W]here the Directors and controlling shareholders are antagonistic, adversely interested, or involved in the transaction attacked, a demand on them is presumptively futile and need not be made." *Abramowitz v. Posner*, 672 F.2d 1025, 1033 (2d Cir.1982) (internal quotations and citations omitted). Specifically, the New York Court of Appeals has stated that demand is excused (1) "when a complaint alleges with particularity that a majority of the board of directors is interested in the challenged transaction;" (2) "when a complaint alleges with particularity that the board of directors did not fully inform themselves about the challenged transaction to the extent reasonably appropriate under the circumstances;" or (3) "when a complaint alleges with particularity that the challenged transaction was so egregious on its face that it could not have been the product of sound business judgment of the directors." *Marx v. Akers*, 88 N.Y.2d 189, 201, 644 N.Y.S.2d 121, 127–28, 666 N.E.2d 1034 (1996). As the plaintiff correctly points out, the test is disjunctive, that is, only one prong of the test need be met for the plaintiff to establish demand futility.

■ At the outset, MSC contends that the plaintiff cannot establish that a majority of the Board personally benefited from the alleged backdating scheme or were otherwise involved in options backdating because the plaintiff has failed to allege the existence of any backdating scheme with particularity. The Court disagrees.

The complaint contains graphic depictions and associated written explanations showing that for fiscal years 1997–2001 option grants took place on the days reflecting either a periodic low in the stock price or just before a substantial rise in the price of the stock. In addition, the

complaint states that "[t]he average annualized return to management on all of the option grants to the Company's most highly compensated executives identified in the relevant proxy statements for fiscal years 1997 to 2001 is 301%, as compared to mere 5% average annualized return to investors—a difference of 296%." (Compl.¶ 56). Thus, the plaintiff states, "[s]even of the eight discretionary options grants to defendants from 1997 through 2001 disclosed in the Company's proxy statements were backdated, as the pattern of the grants was more than fortuitous and each grant preceded a substantial rise in the price of the Company's stock." (Compl.¶ 54).

MSC attacks the method of statistical analysis Plymouth used to support its allegations of backdating. First, MSC contends that the plaintiff's method is flawed because the use of an analytical model to infer that backdating occurred requires more than merely tracking stock price movement. MSC contends that the plaintiff has failed to properly support its allegations with admissions or statements by MSC employees or other witnesses, contemporaneous documents, or restated historical financial statements tending to support its back-dating theory. In addition, MSC contends that the plaintiff has identified only some MSC's publicly disclosed stock option grants in their analysis, but not all. In response to this last point, Plymouth notes that it intentionally limited its analysis to the eight discretionary incentive option grants made by the Company during the relevant period, and of these eight grants, seven show a striking pattern of highly favorable exercise prices—at or near a periodic low.

As explained below, the plaintiff's claims stemming from the alleged backdated stock option grants themselves are time-barred. However, because the plaintiff's claims regarding false and misleading financial statements are timely, and the ex-

istence of a backdating scheme is important background for those claims, the Court will consider the sufficiency of the plaintiff's back-dating allegations.

The plaintiff has alleged the existence of stock option backdating with sufficient particularity to withstand a motion to dismiss. The plaintiff has provided the Court with the dates of the specific disputed grants; the stock price on those dates, graphically compared to the price on days before and after the grants; a twenty day return accruing to option grantees, annualized and compared to the annualized return to investors; the specific language of what the parameters for granting stock options were pursuant to the Company's Stock Option Plans; and the specific allegedly misleading statements and disclosures regarding the options grants. *See Ryan,* 918 A.2d at 355 (finding sufficient particularity where the plaintiff "point[ed] to specific grants, specific language in option plans, specific public disclosures, and supporting empirical analysis to allege knowing and purposeful violations of shareholder plans and intentionally fraudulent public disclosures"). It is difficult to see how a corporate outsider could produce a more complete picture, including documents, admissions, and witness statements—items MSC proposes that the plaintiff should produce—prior to discovery.

In addition, the plaintiff's analytical method was not inherently flawed. The plaintiff's analysis follows accepted methodologies used to support an inference of backdating of discretionary incentive options grants to employees. In *Ryan,* the Delaware Court of Chancery explained that in an analysis similar to the one employed by the plaintiff here, Merrill Lynch "measured the aggressiveness of timing of option grants by examining the extent to which stock price performance subsequent to options pricing events diverges from

stock price performance over a longer period of time." *Ryan,* 918 A.2d at 346. Specifically, the court explained, Merrill Lynch "looked at annualized stock price returns for the twenty day period subsequent to options pricing in comparison to stock price returns for the calendar year in which the options were granted." *Id.* at 346–47. The plaintiff here has submitted a similar analysis.

Further, the *Ryan* court stated that although the Merrill Lynch analysis did not conclusively state that backdating had occurred, "it emphatically suggest[ed]" that grant dates were manipulated. *Id.* at 355 n.34 (stating also that the court "is required to draw reasonable inferences and need not be blind to probability"); *see also Louisiana Mun. Police Employees' Retirement Sys. v. Countrywide Financial Corp.,* No. CV. A. 2608, 2007 WL 2896540, at *1, *11 (Del.Ch. Oct.02, 2007) (finding "no compelling reason why a statistical correlation, if adequately supported by a sound, logical methodology and competent expert testimony, cannot constitute "some evidence" of possible corporate wrongdoing" where, at trial, the expert utilized a fifteen day window for comparing stock prices"); *Conrad v. Blank,* 940 A.2d 28, 35, 40n.30 (Del. Ch.2007) (declining to discount the plaintiff's analysis where "she calculated the performance of the allegedly backdated option grants in relation to the return of the common stock over the same period" and "compared annualized 20–day stock returns following option pricing events to the stock's calendar year annual return").

The Court recognizes that the plaintiff's methodology includes only incentive grants, rather than all publicly reported grants, during the relevant period. However, the plaintiff's analysis included all discretionary incentive grants during the relevant period, thus leaving aside option grants that were not susceptible to back-

dating and irrelevant to its claims. *Cf. Desimone v. Barrows,* 924 A.2d 908, 941n.114 (Del. Ch.2007) (articulating doubt as to the statistical support for an inference of wrongdoing where there was no indication from the face of the complaint that the two grants analyzed were the *only* two officer grants during the relevant period, and the plaintiff failed to determine the annualized return that the grant recipients earned). The Court finds the plaintiff's methodology, accompanied by the particular allegations regarding the option grants in issue is sufficient at this juncture. However, it is important to note that while the allegations in the plaintiff's complaint are sufficient to withstand the present motion, they do not conclusively establish the existence of a backdating scheme.

 The Board that is in place at the time the complaint was filed is the one that must be considered in determining whether a demand is excused. *In re Nyfix, Inc. Derivative Litigation,* 06CV01320, 2008 WL 2890889, at *4 (D.Conn. July 25, 2008). The plaintiff must establish that a majority of this Board was "incapable of acting in an independent and disinterested fashion regarding demand." *Ryan,* 918 A.2d at 352. Here, the Board at the time of the complaint consisted of defendants Sandler, Boehlke, Jacobson, Fradin, Kelly, Langton, and Peller.

 The plaintiff alleges that Sandler, Boehlke, and Jacobson received backdated stock options and, therefore, directly benefited from the backdating scheme. "A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders...." *Nyfix,* 2008 WL 2890889, at *4. As the plaintiff's allegations of backdating are sufficient to withstand a motion to dismiss under the heightened pleading requirement, the plaintiff has also sufficiently alleged the

personal interest of these three directors. However, the plaintiff fails to allege personal interest in the remaining four Board members. Thus, for a demand to be excused, the plaintiff must allege that those members did not fully inform themselves about the challenged transaction to the extent reasonably appropriate under the circumstances or that the challenged transaction was so egregious on its face that it could not have resulted from the exercise of sound business judgment.

■■■ MSC contends that mere membership on the Board, or on a particular committee at the time the challenged transactions occurred is insufficient to establish bias that would excuse demand. Even approval or acquiescence in the challenged activity, MSC contends, without more, will not excuse a demand. However, the complaint here sufficiently alleges activities so egregious by a majority of the present Board that their independence in acting on behalf of the company is presumably compromised.

The plaintiff alleges that the current members of the Compensation Committee, Fradin (as of July 1998), Kelly (as of April 1996), Langton (as of July 1997), and Peller (as of April 2000), each knowingly approved at least some of the allegedly backdated stock option grants. Specifically, with respect to grants bearing the dates of November 9, 2000, and September 21, 2001, the plaintiff alleges that these Compensation Committee members "had the sole authority to choose the date and, in fact, did choose the date on which this stock option was granted. Fradin, Kelly, Langton, and Peller approved this grant on a date after the reported grant date and knowingly used hindsight to pick the date when MSC's stock was poised to substantially increase over the following months." (Compl.¶ 72, 74).

Thus, the complaint alleges more than mere membership on a Committee; rath-er, it alleges that these directors actively participated in the backdating scheme, and knowingly violated the terms of the Company's Stock Options Plans. "A director who approved the backdating of options faces at the very *least* a substantial likelihood of liability.... Backdating options qualifies as one of those rare cases [in which] a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists." *Ryan,* 918 A.2d at 355–56 (internal quotations and citations omitted); *see also Melzer v. CNET Networks, Inc.,* 934 A.2d 912, 914–15 (Del.Ch.2007) ("'[T]o the extent a director knowingly backdated a stock option in violation of the company's charter, that director's action is ultra vires and is not the product of valid business judgment. If a majority of the current board engaged in backdating, demand would be excused.").

In addition, the plaintiff alleges that the Stock Option Plans in place from 1995, through at least 2001, all provide that with respect to incentive stock options granted to employees, "the option price must not have been less than 100% of the fair market value of the Common Stock on the date the option was granted." (Compl.48, 51, 53). Accordingly, the plaintiff contends that by back-dating option grants to allow for a price less than 100% of the fair market value of the Common Stock on the date that the option was granted, the Board members, especially those serving on the Compensation Committee during the relevant period, knew or should have known that they violated the terms of the Company's Stock Option Plans.

Indeed, the members of the Compensation Committee must have been aware that options granted with dates bearing stock prices below the fair market value on the date of the grant would violate the unam-

biguous requirements of Company's Stock Options Plans. In *Ryan*, the court found that the knowing violations of stock option plans could not have resulted from a valid exercise of business judgment. *See Ryan*, 918 A.2d at 354. MSC concedes as much in its opposition.

Finally, with respect to its allegations regarding the filing of false financial statements, the plaintiff alleges that the members of the Audit Committee, Fradin (as of July 1998), Kelly (as of April 1996), Langton (as of July 1997), and Peller (as of April 2000), knowingly participated in the issuance of false and misleading shareholder reports. In this regard, the complaint alleges:

> Between 1997 and 2002, the Defendants repeated in proxy statements that the stock options grants made during that period carried an exercise price that was 'not less than the market value of the Common Stock on the date of grant.' However, the Defendants concealed, and continue to conceal, that the stock option grants were repeatedly and consciously backdated to ensure that the strike price associate with the option grants was below fair market value.

(Compl.¶ 59).

In addition, the complaint asserts that the Fiscal Year Proxy Statements for the years 2000, 2001, and 2002 "falsely reported the dates for stock option grants to certain defendants" and "failed to report the true value of the compensation paid to [certain defendants], or that the options were backdated as alleged herein, rather than issued on the date at which the stock traded at the market value identified in the proxy statement." (Compl. ¶¶ 96, 97, 99, 100, 102, and 103). Further, the plaintiff makes similar specific assertions regarding false 10–K statements for the same years:

> [T]he Defendants ... caused MSC to falsely state that the Company used the intrinsic value method specified by Accounting Principles Board Opinion No. 25 ["APB 25"] to calculate compensation expense associated with issuing stock options and, accordingly, recorded no such expense as such issuances were at fair value of the Company's common stock [on] the date of grant. Under APB 25, if the exercise price of the Company's stock options is not less than the market price of the underlying stock on the date of grant, no compensation expense is recognized. Such statements were materially false and misleading in each of these years because MSC has granted stock options at prices that were below fair market value on the date of the grant and failed to account for the in-the-money options as required by APB 25.

As alleged previously, APB 25 required the Defendants to record compensation expense for options that were "in-the-money" on the date of the grant. However, they did not do so, thereby materially understating its net loss. These statements were designed to conceal, and did in fact conceal, the fact that the Defendants were engaged in continuous and systematic scheme of backdating stock option grants to MSC insiders in violation of state and federal laws. (Compl.¶¶ 106–07).

■ Directors approving false financial and proxy statements face a substantial threat of personal liability. See *Ryan*, 918 A.2d at 356 n. 38. Here, the Court finds that the plaintiff's complaint is sufficiently particular to support its allegations that the members of the Compensation and Audit Committees picked the dates that the granted options would bear, knowingly backdated option grants, violated the Company's Stock Options Plans, and falsified financial statements and disclosures. Therefore, the allegations of wrongdoing

by the Board in place at the time the complaint in this action was filed are sufficient to raise a doubt as to their impartiality in initiating suit on behalf of the Company. The Court finds that a demand upon the Board in place at the time that this action was filed would have been futile and is accordingly excused.

### 2. Contemporaneous Stock Ownership

■ Federal Rule of Civil Procedure 23.1 requires the complaint in a derivative action to "allege that the plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law." Fed.R.Civ.P. 23.1(b)(1). *See also In re Bank of New York Derivative Action,* 173 F.Supp.2d 193, 194 (S.D.N.Y.2001). Similarly, under New York's Business Corporation Law the plaintiff in a shareholder derivative action must assert that he is, and was at the time of the transaction about which he complains, a "holder of shares or of voting trust certificates of the corporation or of a beneficial interest in such shares or certificates." *Kalin,* 526 F.Supp.2d at 405 (quoting N.Y. B.C.L. § 626(a)-(b)).

Despite MSC's contentions, the law of this Circuit does not require that the plaintiff indicate the specific dates or time-periods on which it obtained MSC stock. Rather, "an allegation that merely employs the language of the rule has been held sufficient to sustain the complaint against a motion to dismiss, although the pleader may be required to furnish greater specificity at some later point in the proceedings." 7C CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1828 (3d ed.1998) (noting "[b]y way of contrast" that while the director demand rule requires pleading with particularity, the contemporaneous

ownership rule does not) (citing *Galdi v. Jones,* 141 F.2d 984, 992 (2d Cir.1944)).

In *Kalin,* the court accepted the assertion that, " '[a]t all times hereinafter mentioned, plaintiff was and ... is the owner and holder of shares of stock' in Xanboo.' " *Kalin,* 526 F.Supp.2d at 407. Similarly, in the case at bar, the Complaint states: "Plaintiff, Plymouth County Retirement Association, was a shareholder of MSC at the time of the wrongdoing alleged herein and has continuously held stock in MSC since that time...." (Compl.¶ 17). The Court finds this allegation to be sufficient and, for the purposes of this motion, accepts the assertion that plaintiff was, and continues to be, a shareholder of MSC.

### B. As to Individual Defendant's Motion to Dismiss the Derivative Complaint

#### 1. Statute of Limitations

The individual defendants move to dismiss as time-barred the plaintiff's claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a, et seq. It is important to note that the plaintiff's factual allegations forming the basis of the claims are based primarily on two sets of activities: (1) the practice of backdating itself; and (2) the filing of statements or disclosures containing false and misleading information about the allegedly backdated option grants.

■ Prior to the enactment of the Sarbanes–Oxley Act of 2002 ("SOX"), Pub.L. 107–204 § 804(a)(2)(b), 116 Stat. 745 (2002), Section 13 of the Securities Exchange Act of 1934 set forth the applicable statute of limitations for Sections 10(b) and 20(a), and Rule 10b–5, providing that commencement of an action had to be within "one year of discovery of the facts constituting the violation and within three years of the violation" *ATSI Commc'ns, Inc. v.*

*Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir.2002). In 2002, SOX extended this statute of limitations for private securities fraud cases and provides that such cases must be brought by no later "than the earlier of: (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation." 28 U.S.C. § 1658(b). "The statutes of limitation and repose in SOX apply to cases filed after SOX's enactment date—July 30, 2002—if the claims were not time-barred as of that date under the prior law." *In re Affiliated Computer Services Derivative Litigation*, 540 F.Supp.2d 695, 700 (N.D.Tex.2007). Under this reasoning, the defendants contend that any activities alleged before July 29, 1999 are barred by the three-year statute of repose in place prior to the enactment of SOX. Further, for the reasons set forth in detail below, the defendants contend that the remainder of Plymouth's claims are time-barred by SOX's five-year statute of repose.

### a. Discovery of the Violations

■ Plaintiff's claims survive the two-year statute of limitations provided for in SOX because the limitations period expressly runs from the time of discovery of facts constituting the alleged violation. Here, the plaintiff was not put on notice of the alleged violations prior to November 15, 2005, two years before to its filing date of November 15, 2007. The Second Circuit has recognized that, "[d]iscovery takes place when the plaintiff obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1042 (2d Cir.1992).

The plaintiff's complaint states that the practice of backdating stock options, "though widespread, remained virtually undetected until such academic research revealed patterns of stock option grants that could not be explained by chance." (Comp.¶ 3). In addition, the plaintiff alleges that the "practice of backdating stock options was first publicly disclosed on March 18, 2006 ..." (Comp.¶ 2).

In May 2005, Professor Erik Lie of the Henry B. Tippie College of Business at the University of Iowa published an article entitled "On the Timing of CEO Stock Option Awards" in the academic journal Management Science, discussing the phenomenon of options backdating. *See In re Monster Worldwide, Inc. Securities*, 251 F.R.D. 132, 135 (S.D.N.Y. 2008). "[I]n early 2006, Merrill Lynch conducted an analysis of the timing of stock option grants from 1997 to 2002 for the semiconductor and semiconductor equipment companies that comprise the Philadelphia Semiconductor Index." *Ryan*, 918 A.2d at 346. In addition, "[o]n March 18, 2006, the *Wall Street Journal* published an article entitled "The Perfect Payday," suggesting that many companies may have engaged in stock option backdating.... The article specifically mentioned five companies by name: Mercury Interactive Corp., Analog Devices Inc., Brooks Automation Inc., Comverse Technology Inc., and Vitesse Semiconductor Corp." *Monster*, 251 F.R.D. 132, 137.

There is no indication that any shareholder of MSC actually knew about or suspected options backdating at MSC before November 15, 2005. Further, although enjoying wide-spread publication, courts have found that the publicly disseminated articles were not so blatant and clear as to put stockholders on notice of potential violations at un-named companies. *Id.* at 137; *Ryan*, 918 A.2d at 360 ("Shareholders may be expected to exercise reasonable diligence with respect to their shares, but this diligence does not require a shareholder to conduct complicated statistical analysis in order to uncov-

er alleged malfeasance."). Accordingly, the plaintiff was not on notice of the alleged backdating prior to November 15, 2005 and the plaintiff's complaint is timely under the two-year SOX statute of limitations.

### b. Statute of Repose

The defendants further contend that Plymouth's claims are untimely under SOX's five-year statute of repose. In, its opposition, the plaintiff concedes that the critical date here is November 15, 2002, five years prior to its filing date of November 15, 2007.

The defendants contend that all of the plaintiff's backdating claims are barred by the statute of repose. Further, the defendants argue that even though the plaintiff alleges the last of the improper grants dated September 21, 2001 was reported in a proxy filing on December 6, 2002, after the critical date, the first financial statement containing that reporting information was a Form 5 filed on October 15, 2002. The defendants argue that the subsequent disclosure of that same information in the proxy filing on December 6, 2002, did not give rise to a new cause of action because it was nothing more than republishing of information that had already been disclosed prior to the critical date. However, the Court is aware of no case holding that the SOX statute of repose runs from the date of the *first* filing of false statements to the exclusion of subsequent publication of the same information, and the defendants offer no support for their position. In fact, as discussed below, the case law is quite to the contrary.

On the other hand, the plaintiff contends that because the defendants filed false and misleading financial statements in the Company's Form 10–K on November 26, 2002, within the five-year statute of repose, all of its claims are timely. Apparently, the plaintiff relies on a form of equitable tolling or continuing violation theory, without expressly saying so.

Where claims are based on a backdated grant of stock options, "the 5–year period begins to run on the date the options were granted." *In re Converse Tech., Inc. Securities Litig.*, 543 F.Supp.2d 134, 155 (E.D.N.Y.2008) (citing *In re Atmel Corp. Deriv. Litig.*, 2007 WL 2070299, at *7 (N.D.Cal. July 16, 2007)). Equitable tolling does not preserve untimely claims based on individual option grants. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 363, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) ("Because the purpose of the 3–year limitation is clearly to serve as a cutoff, we hold that tolling principles do not apply to that period.").

If options were in fact secretly backdated, the shareholders could not be expected to discern the actual date on which they were granted because by their very nature they bear an inaccurate date. Here, the last grant that the plaintiff alleges was backdated bears the date of September 21, 2001. Assuming that the actual date on which the grant was issued fell within the same fiscal year, it must have occurred on or before August 31, 2002. Indeed, the complaint states that the Board of Directors backdated grants of stock options "from 1997 to 2001." (Compl.¶ 57). Accordingly, all of the contested option grants must have actually occurred prior to the critical date of November 15, 2002, rendering them time-barred.

However, the plaintiff's claims with respect to the Company's false and misleading financial statements and disclosures remain timely. "In accordance with Section 1658(b)'s focus on the particular statutory 'violation' at issue, to the extent that [the plaintiff's] claims are based on misleading *disclosures* about options backdating or other accounting practices, the 5–year period ... begins to run on the

date of such disclosures, not on the date of grant of the backdated options." *Comverse*, 543 F.Supp.2d at 155 (emphasis added). Here, the complaint contains the following timely allegations based on false and misleading disclosures of backdated stock options:

**False Proxy Statements**

On December, 6, 2002, the Company, with the effect of concealing the improper option backdating, filed with the SEC and disseminated to MSC's shareholders the Fiscal Year 2002 Proxy Statement, which provided, among other things, notice of and information for MSC's annual shareholders' meeting to be held January 8, 2003. The Fiscal Year 2002 Proxy Statements falsely reported the dates of stock option grants to certain Defendants, including the purported September 21, 2001 date for stock options granted to Jacobson, Anker, Sandler, Schroeder and Boehlke, stating that the options were granted "under the 1998 Stock Option Plan and 2001 Stock Option Plan." These statements were materially false and misleading in light of the backdating alleged herein.

(Compl.¶ 102).

**False 10–K Filings**

Defendants Jacobson, Boehlke, Boxer, Sandler, Schroeder, Fradin, Kelly, Langton and Peller, who signed the Form 10–K for the year ended August 31, 2002, filed with the SEC on November 26, 2002, knowingly approved the false statements in the 10–K and knew that the statements were false because they backdated the option grants and knew that they were violating [APB 25 and the Internal Revenue Code].

(Compl.¶ 105(f)).

**False Form 4s**

[F]rom 2003 to 2006, MSC, with the knowledge, approval, and participation of each of the Defendants, for the purpose and with the effect of concealing the improper option backdating, filed with the SEC numerous Form 4s that falsely reported the dates of stock option grants to certain Defendants. . . .

(Compl.109).

The issue, here, is whether the defendants' alleged filing of false and misleading financial statements after November 15, 2002 preserves plaintiff's claims based on activities occurring prior to that date. In *Comverse*, the plaintiff argued that "pursuant to the 'continuing violations doctrine,' when a misleading disclosure that would otherwise be time-barred is republished, the 5–year period of repose on the original disclosure starts to run only when it is last republished." *Comverse*, 543 F.Supp.2d at 155. Judge Garaufis noted the skepticism expressed by courts in the circuit when asked to apply the continuing violations doctrine to security fraud cases and determined that:

[I]t would be prudent to defer consideration of this issue until the factual record here is more fully developed. . . . [B]ecause this is an uncertain area of the law, the court desires, before making a determination, as complete a factual record as possible. This is especially so as it is difficult to determine at this point whether the factual predicate required for the application of the continuing violations doctrine—the commission of continual unlawful acts—has been met here.

*Id.* Here, the plaintiff has not expressly raised a continuing violations argument.

*In re Dynex Capital, Inc. Securities Litig.*, No. 05CV1897, 2006 WL 314524 (S.D.N.Y. Feb. 10, 2006), *vacated in part by* 531 F.3d 190 (2d Cir.2008), Judge Baer held that where "a series of fraudulent misrepresentations is alleged, this 'period of repose begins when the last alleged misrepresentation was made.'" *Dynex*, 2006 WL 314524, at *5 (quoting *Teamsters*

*Local 445 Freight Div. Pension Fund v. Bombardier Inc.,* No. 05CV1898, 2005 WL 2148919, at *5 (S.D.N.Y. Sept. 6, 2005)). The court found the plaintiff's claims regarding earlier filed documents timely because "the misrepresentations contained in the offering documents were followed by additional materially false statements regarding the same subject matter." *Id.* at *5. In reviewing Judge Baer's decision, the Court of Appeals for the Second Circuit expressly declined to reach the district court's determination of the statute of limitations issue. *Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc.,* 531 F.3d 190, 192 (2d Cir. 2008).

Other jurisdictions have arrived at varying and inconsistent results on this issue. Some jurisdictions have found that the statute of repose for all alleged activities runs from the date of the last filed false or misleading financial statement. Others have excluded all activities occurring outside of repose period, regardless of how closely related they are to a timely public disclosure.

For example, the District of Massachusetts has stated that the period of repose runs from the date of the *last* alleged misrepresentation by any of the defendants. *See Winters v. Stemberg,* 529 F.Supp.2d 237, 246–47 (D.Mass.2008); *Quaak v. Dexia S.A.,* 357 F.Supp.2d 330, 338 (D.Mass.2005) (stating that "under Section 10(b), the statute of repose runs from the date of the last fraudulent misrepresentation" and finding actions occurring outside of the repose time-frame timely where they bore a sufficient nexus to the later filed financial statements). Under this approach, both claims directly related to options backdating and those relating to false financial statements reporting option grants would be timely under the five year statute of repose.

In contrast, the Northern District of California has found that plaintiffs "may not avoid the effect of the statute of limitations by combining allegations of recent financial statements and time-barred option backdating." *In re Apple Computer Inc., Derivative Litigation,* No. 06CV4128, 2007 WL 4170566, at *5 (N.D.Cal. Nov. 19, 2007) (dismissing plaintiff's claims because they relied on such a combination, but granting leave to replead). Further, in *In re Juniper Networks, Inc. Securities Litigation,* 542 F.Supp.2d 1037 (N.D.Cal.2008), the Court found that the plaintiffs' § 10(b) claim could not include any allegedly false statements made prior to the threshold date of the repose period. *Juniper,* 542 F.Supp.2d at 1051 (stating that "any part of Plaintiffs' § 10(b) claim based on pre-repose period representations is barred even if the injury did not occur until after period began").

Thus, the law in this area is somewhat unresolved. With respect to the plaintiff's claims based on false and misleading public disclosures and financial statements, the weight of authority, including in this Circuit, dictates that the five year statute of repose first runs from the date of the last alleged misrepresentation regarding related subject matter. As those statements made within the repose period likely bear a factual nexus to statements made outside of the repose period, the plaintiff's claims grounded on false and misleading financial statements and disclosures are timely. However, as the plaintiff's backdating claims are based on activities occurring before the critical date of November 15, 2002, they are time-barred by the five year statute of repose.

## 2. Sufficiency of the Pleadings

■ Securities fraud cases are subject to heightened pleading requirements stemming from two sources. First, Federal

Rule of Civil Procedure 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). "A securities fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns*, 493 F.3d at 99; *see also Hall v. Children's Place Retail Stores, Inc.*, No. 07CV8252, 2008 WL 2791526, at *4 (S.D.N.Y. July 18, 2008) ("Allegations that are conclusory or unsupported by factual assertions are insufficient.").

In addition, the Private Securities Litigation Reform Act ("PSLRA"), enacted in 1995, further heightens these pleading requirements. The PSLRA states that in a securities fraud case alleging a material misrepresentation or omission "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C § 78u–4(b)(1). In addition, the PSLRA requires that in cases where a particular state of mind on the part of the defendant is required, the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

### a. Section 10(b) and Rule 10b–5

■■■■ "In order to state a claim under Rule 10b–5 for misrepresentations, the plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *Hall*, 2008 WL 2791526, at *5 (internal quotations and citations omitted). Similarly, a Section 10(b) claim requires particular allegations "(1) that the defendants committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *In re Alstom S.A. Securities Litig.*, 406 F.Supp.2d 433, 474 (S.D.N.Y.2005). The defendants attack the adequacy of the complaint with respect to the requirements of scienter and reliance by MSC.

Counts I and II of the complaint, directed to alleged violations of § 10(b), Rule 10b–5, and § 20(a) are limited to the present members of the Board—defendants Jacobson, Sandler, Boehlke, Fradin, Kelly, Langton, and Peller. Thus, the heightened pleading requirements must be met with respect to the alleged activities of those individuals.

### i. Scienter

■■■■ The defendants contend that the complaint fails to make allegations constituting strong circumstantial evidence of conscious misbehavior or recklessness. The defendants argue that a general imputation of knowledge **does** not suffice to establish individual liability and that the plaintiff must make specific factual allegations that each defendant was given information about the alleged misrepresentations to put them on actual or constructive notice of fraudulent activity. In addition, the defendants contend that the plaintiff has failed to plead particularized facts detailing the directors' specific roles in the options granting process and has failed to bolster its pleading with witness statements or contemporaneous documents. Thus, the defendants contend that the plaintiff's statements that Board members must have had knowledge of wrongdoing based merely upon their membership on

the Board or certain committees are insufficient to satisfy PLRSA.

Further, the defendants contend that the plaintiff cannot establish that the four outside Board members derived any personal and concrete benefit from the alleged backdating scheme. With respect to the three inside directors who did receive options grants, the defendants contend that plaintiff has failed to allege that they even knew the options they received were backdated or that they had the opportunity to manipulate option grants.

■■■■ The Supreme Court has recently illuminated the required state of mind constituting scienter under PLRSA as "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* —— U.S. ——, 127 S.Ct. 2499, 2507, 168 L.Ed.2d 179 (2007). To be "strong," "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of fraudulent intent." *Id.* at 2504–05. However, the "inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences. *Id.* at 2510 (internal citations or quotations omitted). Thus, on a motion dismiss, the inquiry is: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 2511.

■■■■ Following, *Tellabs,* the Second Circuit reaffirmed its position that "recklessness is a sufficiently culpable mental state in the securities fraud context." *Dynex,* 531 F.3d at 195 (citing *Novak v. Kasaks,* 216 F.3d 300 (2d Cir.2000)). The Second Circuit has further explained that the test remains the same and the required strong inference

may arise where the complaint sufficiently alleges that the defendants: (1) benefited in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor. *Id.* (quoting *Novak,* 216 F.3d at 308–09). However, "[m]ere allegations that the defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Hall,* 2008 WL 2791526, at *5.

Although the plaintiff alleges generally that the director defendants violated Section 10(b) by "intentionally or recklessly employ[ing] devices, schemes and artifices to defraud and engag[ing] in acts, practices, and a course of business which operated as a fraud and deceit upon the Company," (Compl.¶ 150), the plaintiff has been more specific in other portions of the complaint and therefore has satisfied the Second Circuit test. The complaint states that:

The Defendants knew, but failed to disclose, that they had engaged in a practice of backdating stock option grants in a manner designed to create immediate and risk-free profits in direct contravention of the Company's stated and shareholder approved stock option plans and proxy statements filed with the SEC. Furthermore, the Defendants knew that because the Company had not taken a compensation expense for backdated options, MSC's reported earnings and expenses were false and misleading and not in compliance with Generally Accepted Accounting Principles ("GAAP"). Thus, by falsifying the date on which options were granted, the Defendants materially understated MSC's

expenses and overstated its income and falsely represented that it had not incurred any expenses for option grants. (Compl.¶ 12).

Even more specifically, the plaintiff's claims are sufficient to particularly allege the individual defendants' personal involvement in both the approval of stock option grants and their knowing approval of false and misleading financial statements and disclosures regarding those grants. Although the allegations regarding backdating are time-barred, they provide important background regarding the claims of false and misleading disclosure statements and must be read in conjunction with those allegations.

With respect to backdating of stock options, the complaint alleges that director defendants Sandler, Boehlke, and Jacobson each personally benefited from a grant of backdated stock options, thus benefiting in a personal way from alleged fraud. (Compl. ¶¶ 22, 27, and 28). However, with respect to the remaining Board members, the motive in backdating is not as clear.

"Where motive is not apparent, .... a plaintiff must show that the defendant's conduct is at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Hall,* 2008 WL 2791526, at *6 (internal quotations and citations omitted). With respect to the outside director defendants, Fradin, Kelly, Langton, and Peller, the complaint chronicles their personal approval of distinct stock option grants, their ability to choose grant dates, the dates and prices at which those grants were made, and why those grants are suspect because they were either followed by a substantial rise in stock price or took place on the date of a periodic low. (Compl.¶¶ 62–74). In addition, as

discussed above, the approving directors either knew or should have known that backdating stock options resulted in acquisition prices less than 100% of the value of Common Stock on the actual day of the grant and violated the Company's Stock Options Plan. *See, e.g., In re Openwave Systems Securities Litig.,* 528 F.Supp.2d 236, 250 (S.D.N.Y.2007) ("[T]he members of the compensation committee were charged with a specific duty to monitor the exercise dates of the options granted .... Their failure to do so, as demonstrated by the facts alleged in the Complaint give rise to an inference of scienter." (internal quotations and citations omitted)).

Even more significant to the remaining claims, the complaint sets forth the director defendants' participation in approving the Company's financial statements and disclosures and particularly points out the alleged misrepresentations contained in each of those publications. For example, with respect to the members of the Compensation Committee (also comprising the members of the Audit Committee), the complaint states that:

> The Compensation Committee reports contained in the Company's Proxy Statements falsely stated that 'stock option grants provide executives with the opportunity to acquire an equity interest in the company and align the executive's interests with that of the shareholders to create shareholder value as reflected in growth in the price of the Class A common stock.' However, the backdated stock options provided the option recipients with immediate profits regardless of the Company's stock performance.

(Compl. ¶ 85 (citing MSC Proxy Statements for Fiscal Years 1997, 1998, 1999, 2000, 2001, and 2002)).

Further, with respect to false Form 10–K's, the complaint states that:

[I]n the Company's annual reports on Forms 10–K for fiscal years 1997 to 2002, the Defendants [comprising the Board in each of those years] caused MSC to falsely state the Company used the intrinsic value method specified by Accounting Principles Board Opinion No. 25 to calculate compensation expense associated with issuing stock options and, accordingly, recorded no such expense as such issuances were at fair value of the Company's common stock at the date of grant. Under APB 25, if the exercise price of the Company's stock options is not less than the market price of the underlying stock on the date of the grant, no compensation expense is recognized. Such statements were materially false and misleading in each of these years because MSC has granted stock options at prices that were below fair market value on the date of the grant and failed to account for in-the-money options as required by APB 25.

.... APB 25 required the Defendants to record compensation expense for options that were "in-the-money" on the date of the grant. However, they did not do so, thereby materially understating MSC's compensation expense and materially overstating MSC's net income or materially understating its net loss. These statements were designed to conceal, and did in fact conceal, the fact that the Defendants were engaged in a continuous and systematic scheme of backdating stock option grants to MSC insiders in violation of state and federal laws.

(Compl. ¶¶ 106 and 107).

■ Upon review of these allegations, one must arrive at the inescapable conclusion that the Board members were more than passive signatories to financial documents and disclosures, but were primarily responsible for recording and reporting the Company's compensation expenses. Further, the complaint alleges that the defendants made false and misleading affirmative statements regarding options grants in Company Proxy Statements, such as statements that the stock options grants made during that period carried an exercise price that was "not less than the market value of the Common Stock on the date of grant." At a minimum, the defendant directors had a duty to investigate whether these statements were accurate. "Recklessness can be shown by defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendant's knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Hall,* 2008 WL 2791526, at *6. The plaintiff's allegations with respect to the responsibilities and actions of the Board members are sufficient to give rise to an inference of scienter.

■ Further, the plaintiff's allegations of accounting violations and violations of GAAP, coupled with the alleged intent to disguise their actions, give rise to an inference of scienter. The complaint alleges that the grants were not recorded in a manner that would ensure proper reporting in the Company's financial statements and disclosures. Also, the complaint alleges that each director defendant knowingly and deliberately participated in and approved the Company's violations of GAAP for improper purposes. The complaint sets forth the alleged GAAP violations as follows:

The Company was ... required to record an expense in its financial statements for any options granted below the current market price ("in-the-money"). In order to provide MSC executives and employees with far more lucrative "in-the-money" options, while avoiding having to inform shareholders about millions of dollars incurred by the Company

in compensation expenses (and without paying the IRS millions of dollars in employment taxes), the Defendants systematically falsified Company records to create the false appearance that options had been granted at the market prices on an earlier date.

(Compl.¶ 116).

The complaint sets forth the reasons behind the backdating scheme by stating:

The Defendants could have achieved the stated purpose of attracting and retaining the best available personnel by granting those employees additional options under their incentive plans, or by granting options at a price less than the fair market value on the date of the grant and simply disclosing and expensing these grants. Instead, the Defendants were able to motivate MSC's employees by backdating option grants in violation of the Company's shareholder-approved stock option plans and improperly reporting these grants in their financial disclosures to improve their bottom line.

Allegations of director defendants' approval of financial statements where they knew those statements did not comply with the requirements of GAAP, accompanied by the corresponding allegations of fraudulent intent are sufficient to raise an inference of scienter. *See Novak,* 216 F.3d at 309 ("[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim. Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient." (internal quotations and citations omitted)).

The circumstantial nature of backdating claims complicates the task of satisfying the particularized pleading requirements of PLRSA. However, where, as here, the plaintiff has particularly claimed that the director defendants either personally bene-

fited from backdated options or knowingly violated the Company's Stock Options Plans and approved false and misleading statements regarding options, the Second Circuit's *Novak* test is satisfied. Furthermore, the inference of scienter is at least as strong as any opposing inference raised by the pleadings. *See Openwave,* 528 F.Supp.2d at 250 (finding that allegations that the defendants signed documents misrepresenting the company's finances, coupled with adequate allegations of scienter, stated a claim under Exchange Act Section 10(b) and Rule 10b–5).

#### ii. Reliance

■■■■ The individual defendants contend that the plaintiff's allegations of reliance are insufficient to withstand a motion to dismiss. "Reliance provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury." *Basic Inc. v. Levinson,* 485 U.S. 224, 243, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). It is well-settled that a shareholder may bring a Section 10(b) action on behalf of a defrauded corporation, even though the corporation, not the shareholder, actually purchased or sold the shares. *See Lawrence v. Cohn,* 932 F.Supp. 564, 571 (S.D.N.Y.1996) (citing *Schoenbaum v. Firstbrook,* 405 F.2d 215, 219 (1968), cert. denied, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219). "Where the action is derivative, i.e., brought on behalf of the corporate issuer, the issuer itself must have been a purchaser or seller of the securities." *In re Faleck & Margolies, Ltd.,* Nos. 89CV8548 and 90CV1356, 1995 WL 33631, at *9 (S.D.N.Y. Jan. 30, 1995). Thus, the reliance at issue is the reliance of the Company on the defendants' allegedly false and misleading statements.

■■■■ The complaint states that the Company "relied upon the Defendants Jacobson, Sandler, Boehlke, Fradin, Kelly,

Langton and Peller's fraud in granting certain Defendants options to purchase shares of the Company's common stock." (Compl.¶ 153). The defendants contend that because the plaintiff alleges that all of the directors had knowledge of the purported backdating and fraud, that knowledge is imputed to the Company. Accordingly, the defendants argue, there can be no reliance by the Company as a matter of law. However, by violating Section 10(b) and Rule 10b–5, "a majority or even the entire board of directors may be held to have defrauded their corporation." *Schoenbaum v. Firstbrook*, 405 F.2d 215 (2d Cir.1968). Thus, the defendants' argument regarding imputation of director knowledge to the Company is unavailing.

■■■■ The question of reliance is closely related to the question of causation. "To establish causation, plaintiffs must demonstrate both loss causation—that the misrepresentations or omissions caused the economic harm—and transaction causation—that the violations in question caused the plaintiff to engage in the transaction in question." *Faleck*, 1995 WL 33631, at *11 (internal quotations and citations omitted). Where Section 10(b) claims are based on specific representations, the plaintiff must allege "that the damage was either a direct result or a reasonably foreseeable result of the misleading statement." *Id.* (internal quotations and citations omitted). "Even where a 10(b) claim is based not on specific misrepresentations or omissions, but rather on a comprehensive scheme to defraud, the plaintiff must still demonstrate causation in fact by showing that defendant's allegedly fraudulent activities were actually responsible for plaintiff's injuries." *Id.* (internal quotations and citations omitted).

■■■■ Plymouth contends that the four outside directors defrauded the Company with respect to the true date of stock options grants, causing the Company to issue stock options below the market rate. The plaintiff states that this has resulted in a loss of funds that the Company should have received, but did not receive upon the exercise of the improperly low-priced options. However, as previously discussed, the plaintiff's Section 10(b) claims with respect to options backdating itself are time-barred. Thus, reliance cannot be grounded upon these stock options.

■■■■ Plymouth further alleges that the Company has incurred and will continue to incur losses due to the false and misleading misrepresentations about the allegedly backdated options. Specifically, Plymouth contends that the statements have caused executive compensation to be improperly recorded, and therefore misstated in MSC's public statements. In addition, Plymouth contends that such mis-reporting may result in additional tax liability.

The Court finds that the alleged damages accruing to MSC solely from the false and misleading financial statements and disclosures are sparse and speculative, at best. Thus, the Court finds that the plaintiff has failed to adequately plead reliance and causation and its Section 10(b) and Rule 10b–5 claims are dismissed with leave to replead. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead.").

### b. Section 20(a)

Defendants argue that Count II of the complaint should be dismissed against the individual defendants because (1) the complaint fails to state an underlying Section 10(b) claim; and (2) the complaint fails to adequately allege culpable participation by any of the individual defendants which would demonstrate contemporaneous knowledge or participation.

Under Section 20(a), a control person is secondarily liable for violations of Section 10(b) of the Exchange Act "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). To "establish a *prima facie* case of liability under § 20(a), a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) "that the controlling person was in some meaningful sense a culpable participant" in the primary violation." *Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir.1998) (quoting *SEC v. First Jersey Securities, Inc.,* 101 F.3d 1450, 1472 (2d Cir.1996)). Here, as the plaintiff has failed to adequately plead all of the elements of a Section 10(b) primary violation, its Section 20(a) claims also fail. Once again, these claims are dismissed with leave to replead.

### III. CONCLUSION

For the foregoing reasons it is hereby:

**ORDERED,** that the nominal defendant's motion to dismiss for lack of standing is denied; and it is further

**ORDERED,** that the individual defendants' motion to dismiss Counts I and II of the complaint is granted without prejudice and with leave to serve an amended complaint containing these causes of action within twenty days from the date of this Order; and it is further

**ORDERED,** the individual defendant's motion to dismiss the plaintiff's common law causes of action, Counts III–VIII of the complaint, is denied without prejudice to renewal at a later time.

**SO ORDERED.**